Martin Bromley and Allyn Bromley v. Commissioner.
Bromley v. Commissioner
Docket Nos. 84961, 84962, 85106, 87770.
United States Tax Court
T.C. Memo 1964-316; 1964 Tax Ct. Memo LEXIS 22; 23 T.C.M. (CCH) 1936; T.C.M. (RIA) 640316; December 9, 1964
Bert B. Rand, Hans A. Nathan, and Samuel Reisman, for the petitioners. Earl C. Crouter, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: These consolidated cases involve *23 deficiencies in income tax and additions to tax for fraud for the calendar years 1953 to 1956, inclusive. The deficiencies in tax and additions to tax by dockets and taxable years are as follows: Note: This case was heard by Judge Clarence V. Opper and briefs were duly filed. Upon his death on June 19, 1964, the case, not having been disposed of, was reassigned to Judge John E. Mulroney and notice was given to the parties that any request for rehearing or reargument might be presented to him within 30 days. No such requests have been received. Additions to tax
Sec. 293(b)
Sec. 6653(b) Docket
I.R.C.
I.R.C. No.
Year
Income tax
1939
1954
84961
1953
$ 598,101.22
$299,050.61
84962
1954
788,999.45
$394,499.73
85106
1955
858,474.09
429,237.05 *
87770
1956
1,160,778.64
580,389.32
The issues are: 1. Whether part of the deficiency for each taxable year is due to fraud with intent to evade tax; 2. Whether, in the absence of fraud, the statute of limitations bars the assessment of a deficiency for 1953, 1954, or 1955; 3. Whether petitioners realized unreported income in *24 each taxable year from partnership and corporate businesses engaged in buying, selling, servicing, and the operation of coin-operated machines, such as slot, music, and merchandise vending machines, and from other sources; 4. Whether various deductions, claimed during the taxable years in the returns of partnerships in which Martin Bromley was a partner, were properly disallowed, thereby increasing his distributive share of the partnership's income, as follows: (a) Depreciation of coin-operated machines by Service Games, Honolulu, and Jimmy & Ray Music Service and adjustment of capital gains in connection therewith; (b) Travel, entertainment, promotion, and general expenses by Service Games, Honolulu, Coast Cigarette Vendors, and Jimmy & Ray Music Service. Some, but not all, of these expense items were deducted by the different partnerships in each taxable year; (c) A theft loss and a bad debt by Coast Cigarette Vendors for 1953; (d) A deduction of $10,000 in 1956 as a pro rata share of the payment on a non-competitive agreement by Coast Cigarette Vendors; (e) A bad debt by Jimmy & Ray Music Service in 1956; (f) A deduction of $12,344.47 as a pro rata share of the loss *25 in 1956 of Service Games, Guam. Other issues raised by the pleadings have been waived or abandoned. Findings of Fact Some facts are stipulated and they are found accordingly. Martin Bromley, whose former name was Martin Bromberg, and Allyn Bromley are husband and wife, residing, during all of the years in issue, in Honolulu, Hawaii. They filed their joint income tax returns for 1954, 1955, and 1956 with the district director of internal revenue at Los Angeles, California. Each of these returns listed Bromley's occupation as "Coin machine operator." A Form 1040 income tax return purporting to report their joint 1953 income tax, to which the names of Martin and Allyn Bromley had been signed by Bromley's father, Irving Bromberg, was filed by Irving Bromberg on or before March 15, 1954 with the district director of internal revenue at Los Angeles, California. Petitioner Allyn Bromley was a housewife and did not participate in the business affairs of her husband. She is a petitioner here because she filed joint returns with her husband. Herein, the term "petitioner" refers to Martin Bromley. In or about 1940, Irving Bromberg, Glen Hensen, James L. Humpert, and the petitioner *26 formed a coin-operated machine company in Honolulu known as Standard Games. This business continued until 1945, at which time it was sold. Shortly thereafter, Bromberg, Humpert, and petitioner re-entered the coin-operated machine business in Hawaii under the name of Service Games, a Honolulu partnership. This partnership business continued until and during the taxable years and will be referred to as Service Games, Honolulu. At various times after Service Games, Honolulu, was organized, Humpert, Bromberg, and Bromley entered into additional coin-operated machine business ventures, which had other partners in each of them. Ray Cheong and Jimmy Sugiyama were additional partners in Jimmy & Ray Music Service; Curtis M. Surber was an additional partner in Coast Cigarette Vendors, also known as Pacific Tobacco Company. Irving Bromberg Company at Los Angeles, California, was a distributor of coin-operated machines. It was operated by Irving Bromberg but there was a contract by which Martin Bromley and Humpert were each entitled to a one-third share of the profits. Each of the partnership ventures in which Martin Bromley had an interest was managed by a different partner. He managed *27 Service Games, Honolulu. Curtis M. Surber managed Coast Cigarette Vendors, and Ray Cheong managed Jimmy & Ray Music Service. The partners had varying percentage interests in the partnerships. Only the managing partner in each partnership was involved in and responsible for the day-to-day operations; he was in complete charge of the operations of the respective partnerships. During the taxable years Irving Bromberg did not actively manage any of the partnership businesses. The partnerships operated under formal partnership registration certificates from the Treasurer of the Territory of Hawaii. Annual registration statements were filed with the Treasurer for all the taxable years. The manager of each partnership selected a different independent public accountant to do the bookkeeping, accounting, audit, and tax work of the business managed by him. Each accounting firm set up the bookkeeping system of each of the various partnerships and kept the books of original entry. The usual practice of the accountants was to have all documents sent to their offices, where the bookkeeping and accounting services were provided. James L. Humpert's function in Service Games, Honolulu, was that *28 of a public relations man who found locations for the machines, "kept location owners happy," and generally did public relations work. He worked full time in Service Games, Honolulu, and played no part in the management of either Jimmy & Ray Music Service, Coast Cigarette Vendors, or Service Games, Guam. In 1951 and 1952 Service Games, Honolulu, employed Richard D. Stewart as a salesman. Stewart continued with Service Games, Honolulu, until early 1952. During the same years, Service Games, Honolulu, employed Raymond J. Lemaire as mechanic and repairman. Lemaire stayed with Service Games, Honolulu, until early 1952. Neither Stewart nor Lemaire ever had any proprietary interest in Service Games, Honolulu, Jimmy & Ray Music Service, Coast Cigarette Vendors, or Service Games, Guam. On or about February 15, 1952, Service Games, Honolulu, and Richard D. Stewart entered into an agreement which, after reciting that Service Games, Honolulu, "is engaged in the sale, servicing and distribution of all types of coin-operated machines in The Hawaiian Islands, the Orient and elsewhere in the world," and that Stewart "plans to move to Japan for the purpose of engaging in the coin-machine business *29 in that country," provided that, in consideration of Stewart's "moving to and settling in Japan for the purpose aforesaid, and other conditions expressed" in the agreement, Service Games, Honolulu, would furnish Stewart with all types of coin-operated machines and Stewart would open and operate an office or location for distribution and servicing of the machines supplied to him in Japan. Stewart agreed to sell the coin-operated machines at a price designated by Service Games, Honolulu, and was to receive a commission of 10 per cent of gross sales. Either party could terminate the agreement by written notice 90 days in advance of the termination date. Irving Bromberg executed the agreement for Service Games, Honolulu. Early in 1952 Stewart and Lemaire left the employment of Service Games, Honolulu, and moved to Japan. There they organized their own partnership business in which each owned a 50 percent interest. The partnership was known as Lemaire & Stewart, but it also did business under the names of Richard Stewart Company, Japan Service Games, Stewart & Lemaire, and Service Games, Japan. The partnership of Lemaire & Stewart purchased used coin-operated machines from Service Games, *30 Honolulu, under the agreement of February 15, 1952 aforementioned. It also purchased coin-operated machines from Irving Bromberg Company. It sold, rented, and serviced coin-operated machines during 1952 and 1953. On November 19, 1952, a bank account entitled "LeMaire & Stewart, Tokyo, Japan" was opened at the Bishop National Bank of Hawaii, Waikiki Branch, Honolulu, with the deposit of $14,237.62. The signature card for this account authorized either "M. J. Bromley - (Trustee)" or "Irving Bromberg" to handle the account and gave 210 Mokauea Street as an address. The bank had no signature card indicating either Lemaire or Stewart was authorized to draw checks on this account. The account was active until December 18, 1953, after which it was inactive and was closed out May 4, 1954. Between the opening and the closing of this account, more than $562,000 was deposited in and checked out of it. The 1953 deposits to this account were $522,017.60 [1]; in 1954, one dollar was deposited in closing out the account. From time to time Stewart and Lemaire transferred funds from Tokyo to the above-described account at the Bishop *31 National Bank at Honolulu. Part of the funds deposited in the "LeMaire & Stewart, Tokyo, Japan" account was used to pay for coin-operated machines and parts invoiced to Lemaire & Stewart, Tokyo, Japan, by Irving Bromberg Company. In 1953, $218,767.42 was paid out of the "LeMaire & Stewart, Tokyo, Japan" bank account to Irving Bromberg Company on such invoices. Prior to September 1953, Stewart, Lemaire, Bromley, Bromberg, and Humpert agreed to form an organization to expand the coin-operated machine business in the countries of the Far East and elsewhere. Stewart and Lemaire consulted their attorneys in Tokyo, who recommended the formation of a corporation under the laws of the Republic of Panama. On or about September 10, 1953, the certificate of incorporation of a corporation called Service Games, Inc., "domiciled in the City of Panama, Republic of Panama," was filed in Panama. Corporations are formally created under the laws of Panama by the presentation of their corporate charters (which, if originally drawn in English, must be translated into Spanish) to the Registro Publico, the public registry in Panama. Service Games, Inc.'s certificate of incorporation was duly filed and *32 registered in the Public Registry Office on September 14, 1953 and recorded in Volume 48, Folio 432, Entry 4554, of the Journal and at Volume 259, Folio 473, Entry 58362, Section of Mercantile Persons. A registered agent, domiciled in Panama, was duly appointed and maintained. Service Games, Inc., complied with the laws and regulations of the Republic of Panama regarding its formation, organization, business transactions, and continued existence. Its charter was never revoked. It will hereafter be referred to as Service Games, Inc., Panama. The charter of Service Games, Inc., Panama, authorized it "to perform any and all functions and acts, and to engage in any and all kinds of business not prohibited by law to a corporation"; provided for the issuance of 1,000 shares of stock without nominal or par value; fixed the domicile of the corporation as the City of Panama, Republic of Panama, but authorized the corporation to "engage in business and establish branches in any part of the world"; provided that the duration of the corporation "shall be perpetual"; provided for a board of directors with stated powers, meetings of stockholders and directors, corporate officers, a resident *33 agent who was named, amendments to the articles of incorporation, and that Stewart, Lemaire, and Bromley should be the initial board of directors. The original stockholders of Service Games, Inc., Panama, were Stewart, Lemaire, Humpert, Bromberg, and petitioner, each of whom owned 20 percent, or 200 shares, of the authorized capital stock. The stock certificates issued to the stockholders were the usual type of printed certificates used by Panama corporations. The form of stock certificate set forth on its face the volume, folio, and entry number where the corporate charter was filed in the public registry office. Stewart, Lemaire, and Bromley held their initial meeting as the board of directors of Service Games, Inc., Panama, on September 21, 1953 in the office of the [*] in Tokyo, Japan. Corporate officers were elected at that meeting as follows: Irving Bromberg - president; James L. Humpert - vice-president; Richard D. Stewart - vice-president, assistant secretary, and general manager; Raymond J. Lemaire - vice-president, assistant treasurer, and assistant general manager; Martin J. Bromley - secretary and treasurer. At this meeting Bromberg and Humpert were elected directors *34 of Service Games, Inc., Panama, their "terms of office to commence" following such meeting. By-laws, a form of stock certificate, and a corporate seal were adopted; and the secretary was instructed to purchase record books and books of account, stationery, and office supplies for the corporation and to file with the Mercantile Registry in Panama a certificate showing the election of the principal officers. The latter certificate was filed by petitioner as secretary on January 3, 1954 in the Office of Public Registration, Republic of Panama. The second meeting of the board of directors of Service Games, Inc., Panama, was held on September 22, 1953. The directors present were Bromley, Stewart, and Lemaire. The directors provided that the partnership of Lemaire & Stewart should represent Service Games, Inc., Panama, in Japan upon the following terms and conditions: 1. Service Games Inc.Panama will ship coin operated machines and related products to a bonded warehouse in Yokohama, Japan. 2. These machines and related products will be sold to various clubs in Far East and ninety (90) percent of the selling price will be remitted to Service Games Inc.Panama. The balance of ten (10) *35 percent will be retained by Lemaire and Stewart as their commission. All expenses incurred in the operation of this business will be paid by Lemaire & Stewart out of their ten (10) percent commission. 3. It must be clearly understood that on all machines shipped to Yokohama, Japan, the freight will be prepaid by Service Games Inc.Panama. It is further undestood that all machines located in the bonded warehouse in Yokohama are the property of Service Games Inc.Panama and ownership of this equipment will not change hands until Lemaire & Stewart present a purchase order and a custom clearance for equipment to be removed from the custom bonded warehouse. Upon presentation of these documents to the Yokohama Trade Express Company and the removal of this merchandise from the handed warehouse, then title to said property will change. 4. The expenses involved in keeping this merchandise in a custom bonded warehouse will be paid for by Lemaire & Stewart out of their ten (10) percent commission. 5. Lemaire & Stewart will be responsible for all taxes applicable under Japanese law that may be imposed upon these machines and will pay a net income tax on all profits retained by them after *36 the usual business deductions have been made from their ten (1/) percent commission. Thereafter, and under date of January 2, 1954, Service Games, Inc., Panama, entered into a written agreement with Japan Service Games of Tokyo (also known as Lemaire & Stewart) implementing the provisions adopted September 22, 1953. The contract was to terminate January 2, 1959 unless earlier modified or terminated by mutual consent. Paragraph 4 of this agreement provided as follows: 4. The First Party [Service Games, Inc., Panama] agrees to furnish buildings (which shall include office, shop space and warehouse), automobiles, trucks and other mobile equipment, for Second Party's [Japan Service Games of Tokyo] Japan operation, and also to supply needed technicians and mechanics for upkeep and servicing of said coin operated machines and related equipment; the Second Party, however, agrees to maintain and upkeep said buildings, offices, shop and warehouse, to pay all expenses incidental to the operation of his business in Japan, including utilities such as telephone and electricity, to pay all insurance coverage on said buildings and equipment incidental to the business, to pay all taxes resultant *37 from said business and further to pay the salaries, and wages of any and all technicians and other employees engaged by the Second Party in said business. Bromley signed the agreement for Service Games, Inc., Panama; Stewart signed it for Japan Service Games. As a general manager of Lemaire & Stewart and Service Games, Inc., Panama, Stewart devoted his entire time to the business affairs of the two companies. Lemaire also devoted his entire time to the business. Most of Lemaire's activities were centered in the Tokyo area, although occasionally he traveled to Okinawa, Korea, and other areas in the Far East. Coin-operated amusement machines of all types were used at officers' clubs and open messes on United States military installations in Japan, Okinawa, Korea, and elsewhere in the Far East. Officers clubs and open messes either bought the machines outright or leased them on a percentage basis. Under the latter arrangement, the net take of the machines was divided between the lessee and the lessor on a 20 to 80, 30 to 70, 40 to 60, or other agreed basis, which varied with the different areas. Lemaire and Stewart and Service Games, Inc., Panama, dealt with numerous officers clubs *38 and open messes during the taxable years. As president of Service Games, Inc., Panama, Bromberg's activities consisted principally of contacting equipment manufacturers in the United States for the purchase of coin-operated machines and parts for shipment overseas. On occasion, he assisted or substituted for Bromley in handling financial matters. As secretary and treasurer of Service Games, Inc., Panama, Bromley handled the deposits in and the disbursements from its Honolulu bank accounts and also placed orders for machines and parts with the equipment manufacturers. Some of these orders were based upon Service Games purchase order forms received from and signed by Richard D. Stewart in Japan and some were based upon telegrams to manufacturers which were merely signed "Bromley." Among others, Bromley and Bromberg purchased equipment and parts, during and prior to the taxable years, from certain equipment manufacturers located in Chicago, Illinois, namely, Judd Distributing Company, Bally Manufacturing Company, and United Manufacturing Company. As a general rule, coin-operated machines and parts shipped overseas by these manufacturers were considered purchases of Service Games, *39 Inc., Panama, and paid for accordingly, while merchandise shipped to Honolulu was considered purchases of or for Service Games, Honolulu, and paid for accordingly. The customers shown on the invoices of the manufacturers were different at times from the customers shown on their ledger sheets and Bromley's instructions regarding shipments and invoices therefor were sometimes ignored. The bank account mentioned above that was handled by Bromley was opened on December 2, 1953. It was an account entitled "Service Games, Inc., Panama" in the Bishop National Bank of Hawaii. The signature card showed the corporate name as above, the corporation's circular seal, the corporate address as "Masonic Bldg. Tokyo, Japan," and set forth a corporate resolution adopted at a meeting held on September 21, 1953, as follows: Resolved that Martin J. Bromley, 210 Mokauea St. is hereby authorized to sign any and all checks, drafts and other orders for and on behalf of Service Games, Inc., Panama for the withdrawal of funds standing at any time to its credit in Bishop National Bank of Hawaii at Honolulu and that said bank be and it is hereby authorized and requested to honor and pay any and all such checks, *40 drafts and orders signed and countersigned as aforesaid. This resolution shall remain in force until written notice of its revocation is received by said bank. Petitioner, as secretary, certified that the corporate board of directors duly adopted the resolution and that his signature, endorsed on the back of the card, was the signature the bank was authorized to honor on behalf of the corporation. On October 11, 1955, an additional signature card was filed which authorized Irving Bromberg to sign checks on the Service Games, Inc., Panama, bank account at the Biship National Bank of Hawaii. The initial deopsit by Service Games, Inc., Panama, in its account at Bishop National Bank of Hawaii was made on December 2, 1953. It was in the amount of $2,000 and represented the payment by petitioner for his 200 shares of stock in the Panama corporation. On December 4, 8, 10, and 21, 1953, similar deposits of $2,000 each were made which represented payments by Humpert, Bromberg, Stewart, and Lemaire, respectively, for the 200 shares of stock in Service Games, Inc., Panama, purchased by each of them. Between December 2, 1953 and December 31, 1956, the total amount deposited in this bank *41 account was $2,974,777.37 and the total amount withdrawn therefrom was not less than $2,909,140.79. A breakdown of the amounts deposited and withdrawn by taxable years is as follows: Year
Deposits
Withdrawals
1953
$ 85,035.83
$ 33,875.75
1954
862,388.60
880,445.87
1955
930,578.86
743,774.15
1956
1,096,774.08
1,251,045.02
Total
$2,974,777.37
$2,909,140.79
With a few exceptions, the $2,974,777.37 deposited in the account of Service Games, Inc., Panama, at the Bishop National Bank between December 2, 1953 and December 31, 1956, inclusive, represented money transferred from Japan and elsewhere in the Orient. The transfers were made primarily by remittance orders, telegraphic transfers, and checks. Many of the remittance orders and telegraphic transfers were by Bank of America, Tokyo, and some by American Express Company, Okinawa, and othes banks. Most of the remittance orders and telegraphic transfers specified Service Games, Inc., Panama, as the payee, but on December 10, 1953 a remittance order for $12,714.26 by Bank of America, Tokyo, named Service Games as the payee and the receipt therefor was signed "Service Games, M. J. Bromley," and on December 11, 1953 a *42 telegraphic transfer of $5,000 by American Express Company, Okinawa, also named Service Games as payee and the receipt, signed by an officer of Bishop National Bank, was stamped on its face, "credited as directed." Each of these transfers was deposited in the account of Service Games, Inc., Panama. Among the numerous checks deposited in the account of Service Games, Inc., Panama, at Bishop National Bank was one listed as "Moe Lipton $100.00" on the deposit slip of January 15, 1955. Lipton, a wholesale jeweler and auctioneer, conducted his business and lived in Honolulu but spent considerable time in Tokyo, Japan. He became acquainted with petitioner in or prior to 1941 and with Stewart before he went to Tokyo. He knew that petitioner was connected with the business of Service Games and that Stewart and Bromley were connected in business. Prior to January 14, 1955, while in Tokyo, Lipton secured 40,000 Japanese yen from Stewart at 400 to 1. At that time the legal rate for Japanese yen was 360 to 1, and Lipton understood that he was to pay $100 for the 40,000 yen upon his return to Honolulu. On January 14, 1955, Lipton issued his check to "M. Bromley" for $100 in payment for the yen *43 secured from Stewart in Tokyo. This check, endorsed "M. Bromley" and "Service Games, Inc., Panama, was deposited to the credit of Service Games, Inc., Panama, at the Bishop National Bank as part of a $1,437.70 deposit on January 15, 1955. Similarly, prior to October 21, 1955, while he was in Tokyo, Lipton secured 100,000 Japanese yen from Stewart. Upon his return to Honolulu, Bromley demanded payment for the yen. On October 21, 1955, in compliance with petitioner's instructions, Lipton issued his check for $250 to "Service Games, Inc.," in payment for the 100,000 yen. This check was endorsed by Service Games, Inc., Panama. On December 17, 1954, petitioner opened an account with the Bishop National Bank of "John Raymond" with an initial deposit of $100. The signature card was signed "John Raymond" by petitioner, with Raymond's address as "210 Mokauea St." The deposits in this account aggregated $7,050, all but the initial deposit being in 1955. The account was closed on March 25, 1955 by the withdrawal of the balance of $97.45. On the same date, March 25, 1955, petitioner opened an account with the same bank in the name of "Robert Mason" with an initial deposit of $97.45. The *44 signature card was signed "Robert Mason" by petitioner, with Mason's address as "210 Mokauea St." Later, and under date of October 15, 1955, a signature card for Irving Bromberg was filed with the bank respecting the Robert Mason account. The deposits in the Robert Mason account aggregated $132,857.10, of which $106,882.10 was deposited in 1955 and $25,975 in 1956. The Robert Mason account was closed on August 7, 1956 by the withdrawal of the balance of $98.58. On February 23, 1956, petitioner opened an account with The Liberty Bank of Honolulu, Hawaii, in the name of "Jeff Jerome" with a deposit of $500. The signature card was signed "Jeff Jerome" by petitioner with a business and residential address of "87, 1-Chome Nishi-Osaki, Tokyo, Japan." The mail address on the signature card was "Service Games, Inc., Panma [Panama], 210 Mokauea St., Honolulu, T.H." The deposits in the Jeff Jerome account during 1956 aggregated $51,320; the account had a balance of $17,820 at December 31, 1956. The funds deposited in the John Raymond, Robert Mason, and Jeff Jerome accounts were held for the benefit of Service Games, Inc., Panama, and all such funds eventually were deposited in the latter's *45 bank accounts. None of such funds was paid to or for the benefit of petitioner. On January 12, 1955, an account entitled "Service Games Inc., Panama & Okinawa, 210 Mokawea [Mokawea] St., Honolulu" was opened at the Bank of Hawaii with an initial deposit of $10,000. The corporate signature card gave the title of the checking account as "Service Games Inc. Panama Okinawa," the name of the corporation as "Service Games Inc.Panama," the nature of business as "Distributor," former bank connection, branch, and address as "Bank America - Tokyo, Japan," and listed the officers as: Irving Bromberg, president; J. L. Humpert, vice-president; M. J. Bromley, secretary; M. J. Bromley, treasurer. The corporate seal was affixed to the signature card, and the corporate resolution authorizing M. J. Bromley, secretary and treasurer, to act for the corporation was set forth on the reverse side of the signature card. On or about October 17, 1955, an additional signature card was filed with the Bank of Hawaii authorizing Irving Bromberg to act for the corporation. The deposits in this account from January 12, 1955 to November 23, 1956 (the bank was unable to locate deposit slips and ledger sheets for *46 the remainder of the taxable year 1956) totaled $297,550.07, and the balance in the account on November 23, 1956 was $22,698.85. The source of the original $10,000 deposit to this account was check number 558 drawn by Service Games, Inc., Panama, on January 11, 1955 to Service Games, Inc., Panama-Okinawa, to "open new account." Deposits in 1955 totaled $179,766.70, and $100,000 thereof was listed as loans to the Okinawa accounts on the check register of Service Games, Inc., of Panama. On March 28, 1956, an account entitled "Service Games Inc., Panama, Korea Div." was opened at The Liberty Bank of Honolulu with an initial deposit of $50,000. The signature card, marked "CORPORATION" in bold-faced type, was signed "Martin J. Bromley Sec. Treas." by petitioner, with the address as "210 Mokauea St." The source of the original deposit to this account was check number 1265 drawn by Service Games, Inc., Panama, on its account with Bishop National Bank in favor of Service Games, Inc., Panama Korea, with the explanation on its check register "new acct." During 1956 eight deposits aggregating $160,288.16 were made in this account, five of which, totaling $150,000, represented loans from Service *47 Games, Inc., Panama. Checks drawn on the account carried the typed name of the account, under which was the signature of petitioner or Irving Bromberg. Over 100 checks were drawn on this account during 1956. The account had a balance at December 31, 1956 of $11,430.60, with $1,800 in checks outstanding. On or about April 30, 1955, petitioner and Irving Bromberg paid James -. Humpert $50,000 each, or $100,000, for his entire interest in the various business enterprises in which the three of them were associated, including his 200 shares of stock in Service Games, Inc., Panama. Thereafter, and on or about January 2, 1956, Raymond Lemaire purchased 50 shares of stock of Service Games, Inc., Panama, from Irving Bromberg for $30,000. Lemaire paid for this stock with a check drawn on his personal account at Bishop National Bank, Honolulu. A certificate for 50 shares of such stock was issued to Lemaire under date of January 6, 1956. Similarly, and on or about January 2, 1956, Richard D. Stewart purchased 50 shares of stock of Service Games, Inc., Panama, from petitioner for $30,000. Stewart paid for the stock with a check drawn on his personal account with the Bank of America, Los Angeles, *48 California. A certificate for 50 shares of such stock was issued to Stewart under date of January 6, 1956. After these transactions, the four stockholders held 250 shares each of the issued and authorized capital stock of Service Games, Inc., Panama. In his 1956 income tax return petitioner reported a capital gain of $29,500 from the sale of 50 shares of stock of Service Games, Inc., Panama. During the taxable years, the principal place of business of Service Games, Inc., Panama, was Tokyo, Japan. By 1955, it was also operating in Okinawa and by March 1956 in Korea. Later its operations were extended to other places in the Far East. While it purchased coin-operated machines, equipment, and parts in the United States, its records contain nothing to indicate sales or rentals in the United States or the Territory of Hawaii. The records maintained by Service Games, Inc., Panama, were kept on the cash receipts and disbursements basis. Such records included invoices, deposit slips, canceled checks, bank statements, vouchers, and check registers. On March 15, 1954, respondent received petitioners' 1953 tax return. On March 12, 1957, he received a signed Form 872 for the taxable year *49 1953 which extended the statute of limitations until June 30, 1958. A similar form was executed by petitioners on January 29, 1958, extending the statute of limitations until June 30, 1959. On April 4, 1955, respondent received petitioners' 1954 tax return. On January 29, 1958, respondent received a signed Form 872 for 1954, extending the statute of limitations until June 30, 1959. On Monday, April 16, 1956, respondent received petitioners' 1955 tax return. On April 7, 1959, respondent received a signed Form 872 for 1955, extending the statute of limitations to December 31, 1959. Samuel Reisman represented petitioner Martin J. Bromley (but not petitioner Allyn Bromley) as intervenor in an action brought by Special Agent Black in the United States District Court for the District of Hawaii entitled "In the Matter of the Application of Robert L. Black, Special Agent, Internal Revenue Service" to enforce obedience to the requirements of summons served upon K. J. Luke (Miscellaneous No. 796), and in an appeal from the order of the District Court in that case, entitled "Martin J. Bromley v. Robert L. Black," No. 16484, filed in the United States Court of Appeals for the Ninth Circuit. *50 On June 5, 1959, Samuel Reisman (but not petitioner) signed a stipulation in the Court of Appeals for the Ninth Circuit, which was also signed by Myron C. Baum, an attorney in the Department of Justice, as attorney for Robert L. Black, appellee. The stipulation provided as follows: It is hereby stipulated by and between the parties to the above entitled action, through their respective counsel of record, that an Order may be entered by the above entitled Court, as follows: 1. That said proceeding be remanded to the United States District Court for the District of Hawaii for the purpose of proceeding in said matter according to law on appropriate pleadings, to the end that a record may be made therein. 2. That the taxpayer, Martin J. Bromley, be given due notice of all proceedings hereafter to be taken in this cause. 3. That said taxpayer, Martin J. Bromley, does hereby waive the benefit of the statute of limitations on all possible claims of the United States for any taxyears upon which the statute of limitations has not already run, for the period up to and including thirty days after the making of a final order herein by any Court. On June 15, 1959, the Court of Appeals *51 for the Ninth Circuit, after nothing that a stipulation had been filed, issued the following order: (1) That said proceeding be remanded to the United States District Court for the District of Hawaii for the purpose of proceeding in said matter according to law on appropriate pleadings, to the end that a record may be made therein. (2) That the taxpayer, Martin J. Bromley, be given due notice of all proceedings hereafter to be taken in this cause. (3) That said taxpayer, Martin J. Bromley, does hereby waive the benefit of the statute of limitations on all possible claims of the United States for any tax years upon which the statute of limitations has not already run, for the period up to and including thirty days after the making of a final order herein by any Court. (4) That the Clerk of the United States District Court for the District of Hawaii keep and retain in his sole custody and possession, in a sealed file, without disclosure to anyone other than the Judge of the District Court for the District of Hawaii, all the papers, records, files, documents and books purportedly belonging to the taxpayer, Martin J. Bromley, which were heretofore delivered to said Clerk by Robert *52 L. Black, Special Agent Internal Revenue Service, pursuant to previous order of said District Court for the District of Hawaii, pending the making of a final order herein by any Court. On October 13, 1959, upon oral motion of the United States Attorney for Hawaii, representing respondent's special agent Robert L. Black, the latter's application to enforce obedience to the requirements of summons served upon K. J. Luke was dismissed, and the clerk was ordered to deliver to Luke, or petitioner, all papers, records, files, documents, and books pertaining to the matter that had been delivered into the custody of the clerk. On November 6, 1959, the statutory notice of deficiency for the taxable year 1953 was mailed to the petitioners. On November 6, 1959, the statutory notice of deficiency for the taxable year 1954 was mailed to the petitioners. On December 30, 1959, the statutory notice of deficiency for the taxable year 1955 was mailed to the petitioners. The deficiencies and additions to tax for fraud for the taxable years resulted principally from respondent's determination that petitioner realized large amounts of additional income which he failed to report on his income *53 tax returns. The unreported income for each taxable year as determined by respondent was as follows: Year
Amount
1953
$ 651,228.63
1954
849,289.20
1955
930,566.80
1956
1,082,032.57 Each deficiency notice explained the adjustment for unreported income as follows (the explanation from the 1953 statutory notice is quoted): It is determined that you realized income from coin-operated machines and other sources in the amount of $651,228.63, which you failed to report on your income tax return. Accordingly, your taxable income is increased $651,228.63. Respondent explained his determination further in his original or amended answers in these cases, wherein he alleged fraud. He determined that Bromley was engaged in and had large substantial interests in various business enterprises and undertakings relating to the buying, selling, servicing, and operation of coin-operated machines, commonly known as slot machines, music boxes, and merchandise vending machines, which were located in the then Territory of Hawaii, in Japan, in Okinawa, Guam, Republic of Panama, Formosa, and various other places unknown to the respondent, from which business enterprises and locations *54 petitioner had derived and received large amounts of unreported net taxable income as above stated. Respondent determined that most of this business was conducted and done by petitioner "in the names of Service Games Japan, Service Games Honolulu, and Service Games Panama"; that, in 1956, $1,080,411.63 from such source was deposited in a bank account controlled by petitioner in the name of Service Games, Inc., Panama, at the Bishop National Bank of Hawaii, at Honolulu; that a large part of such amount was handled and received by and on behalf of petitioner in the form of cash, money orders, checks of third persons, and other evidences of money and things of value, periodically and systematically during 1956; and that such moneys and receipts were gathered and commingled together, so that, without the benefit of petitioner's books and records, respondent is unable to furnish any more detailed itemization of the exact sources of all of this income. Respondent's determination as to the taxable year 1956 is typical of his determination as to each of the other taxable years except as to the amount of unreported income for each such year. The net income reported by petitioner for 1953, *55 1954, 1955, and 1956, $59,639.87, $76,304.79, $38,937.69, and $74,361.22, respectively, included his share of the partnership income or loss of Service Games, Honolulu, Jimmy & Ray Music Service, Coast Cigarette Vendors, and Service Games, Guam. Respondent adjusted the partnership income or loss as reported by each of these four partnerships and thereby adjusted petitioner's distributive share. Respondent's adjustments of the partnership income of Service Games, Honolulu, for 1953 increased its income by $11,373.94. The increase resulted from the disallowance of the following deductions: (1) All depreciation claimed on coin-operated machines, $6,938.57; (2) entertainment expense, $777.70; and (3) travel expense, $3,657.67. The depreciation deduction was disallowed because "it has not been established that any deduction for depreciation is allowable." The deductions for entertainment and travel expenses were disallowed "because it has not been established that such" expenditures were "in fact made, or if made, * * * constituted an ordinary and necessary business expense or was expended for the purpose designated." For each of the taxable years 1954, 1955, and 1956, respondent increased *56 the income reported on the partnership returns of Service Games, Honolulu, by disallowing all deductions claimed for depreciation of coin-operated machines, for entertainment expenses, and for travel expenses. The explanations for disallowing such deductions were the same as for disallowing the 1953 deductions. The amounts disallowed were as follows: Deductions claimed
1954
1955
1956
Depreciation, coin-operated machines
$53,100.90
$94,566.29 *
$93,260.81
Entertainment expense
1,345.54
1,965.30
2,935.60
Travel expense
4,716.06
3,796.02
2,159.82
The books and records of Service Games, Honolulu, for the fiscal years ended June 30, 1949 through 1952 were examined by Revenue Agent Wong. As a result of adjustments made by Wong in these years, Service Games, Honolulu, amended its 1953 partnership return to conform with Wong's adjustments for earlier years. Wong's report on his examination of the books and records of Service Games, Honolulu, for the period June 30, 1949 to June 30, 1953 was dated October 28, 1954, and the covering *57 letter transmitting a copy of the revenue agent's report to Service Games, Honolulu, was dated December 21, 1954. Wong's investigation disclosed that Service Games, Honolulu, purchased, rented, and serviced pinball machines, music boxes, and other coin-operated amusement devices. After these machines became outmoded, Service Games, Honolulu, sold them locally or abroad to military or semi-military establishments. Depreciation was claimed on the machines, without setting aside salvage value, upon the basis of a 1-year life for pinball and slot machines and a 3-year life for music boxes. As a result of these depreciation rates, the machines that were sold frequently had a basis for gain or loss of zero. For fiscal years prior to 1950, these gains were reported by the partnership as ordinary income. In subsequent fiscal years, gains on machines held more than 6 months were reported as capital gains. At the conferences with Wong, Service Games, Honolulu, requested the agent to compute gains prior to fiscal 1951 as capital gains. After a number of informal conferences, capital gain treatment was agreed to for sales of machines held over 6 months provided a reasonable amount was set aside *58 for salvage value in computing depreciation. The estimated useful life and salvage value agreed to by respondent and Service Games, Honolulu, which was represented by Martin J. Bromley and accountants, were as follows: pinball machines, 1 year, salvage 25 percent of cost; slot machines, 2 years, salvage 33 1/3 percent of cost; music boxes, 2 years, salvage 25 percent of cost. For its fiscal years ending June 30, 1953 through June 30, 1956, Service Games, Honolulu, used the depreciation rates agreed to for the previous years and set up salvage values in the agreed amounts. Its books and records included a depreciation register, vendors' invoices, sales invoices, and the depreciation expense reflected on the partnership returns. From these records an individual machine could be identified as to the vendor, the cost, the date of acquisition, the depreciation taken on the machine, the date of disposition, the salvage value, and the sales price. The coin-operated machines on hand at June 30, 1952, the machines acquired and sold during the fiscal years June 30, 1953 through June 30, 1956, the balance on hand on the latter date, in dollar amounts, and the depreciation expense reflected *59 on the books of Service Games, Honolulu, for such fiscal years is as follows: Depreciation
Acquisitions
Sales
expense
On hand June 30, 1952
$ 66,686.52
June 30, 1953
215,978.86
$183,993.49
$41,866.24
June 30, 1954
162,659.58 *
137,177.31
53,100.90
June 30, 1955
257,124.34
183,620.55
83,801.31
June 30, 1956
276,234.53
244,806.39
93,260.81
On hand June 30, 1956
236,574.62
For the fiscal years ending June 30, 1953, 1954, and 1955 of the partnership Service Games, Honolulu, respondent determined that net long-term capital gains were overstated by $4,538.42, $24,147.29, and $45,612.78, respectively, by reason of his disallowance of depreciation expense. Bromley's share of such overstatements was determined to be $1,332.80, $7,797.90, and $16,402.97, respectively. For the fiscal year 1956 of Service Games, Honolulu, respondent determined that the proceeds from the sale of amusement machines were ordinary income because it had not been established that these proceeds were from the sale of capital assets and accordingly he decreased net long-term capital gain and net short-term *60 capital gain of the partnership by $106,991.30 and $20,622.99, respectively. Bromley's share thereof was $53,495.65 and $10,311.50, respectively, which was taken into account in determining his 1956 income tax liability. For the fiscal year ended June 30, 1956, respondent also adjusted the partnership income reported by Service Games, Honolulu, by disallowing a deduction for general expense in the amount of $2,206.49. His explanation of the adjustment was that "it has not been established that such expenditure was in fact made or, if made, that it constituted an ordinary and necessary business expense or was expended for the purpose designated." During the fiscal year ended June 30, 1956, the books and records of Service Games, Honolulu, contained entries represented by 75 checks, ranging in amounts from $1.00 to $173.35, charged to the general expense account. These entries were made in the regular course of business by the partnership's accountants and virtually every expenditure was supported by a paid bill. A schedule of the 75 checks shows the number of the check, the date, the payee, and the amount charged to the general expense account but no additional information as to *61 the item or its relationship to the business of Service Games, Honolulu. On its partnership returns for the calendar years 1953, 1954, and 1955, Jimmy & Ray Music Service reported losses of $42,259.06, $32,879.85, and $18,598.31. On its 1956 return, the partnership reported ordinary income of $59,059.70. Capital gains were reported by the partnership for 1954, 1955, and 1956 as follows: 1954
1955
1956
Net short-term capital gain
$1,434.38
$ (145.80)
$ 129.94
Net long-term capital gain
1,375.11
6,987.16
89,975.21
In computing partnership income or loss for 1953 to 1956, inclusive, Jimmy & Ray Music Service claimed depreciation deductions, which included depreciation on amusement equipment, as follows: 1953
1954
1955
1956
Depreciation claimed
$62,066.49
$81,819.45
$69,420.59
$44,988.08
Portion representing amusement equip-
ment
60,539.85
77,788.88
65,554.36
41,791.94 Respondent adjusted the partnership income or loss for each year by disallowing all that portion of the depreciation deduction representing depreciation on amusement equipment "because it has not been established that any deduction for depreciation *62 is allowable." (The amount disallowed for 1954 was $77,888.88 instead of $77,788.88, as claimed in the return.) The depreciation adjustments changed the losses reported by Jimmy & Ray Music Service for 1953, 1954, and 1955 into ordinary income and increased the ordinary income reported by the partnership for 1956. Also, by reason of the disallowance of depreciation, respondent determined that Jimmy & Ray Music Service overstated capital gains for 1954, 1955, and 1956. Bromley's distributive share of the partnership's ordinary net income and capital gains was adjusted accordingly. For 1956, respondent determined that Jimmy & Ray Music Service realized ordinary income in the amount of $91,750 from amusement devices and other sources. The partnership reported this income on its partnership return as proceeds from the sale of amusement devices resulting in a net long-term capital gain of $88,887.68. Respondent determined that, although the records show that the partnership received these proceeds, it has not been shown that the proceeds were from the sale or exchange of capital assets. The partnership's ordinary income was increased by $91,750, the total amount received, and net long-term *63 capital gain was decreased $8,887.68. In determining petitioner's distributive share of the partnership income of Jimmy & Ray Music Service for 1955 and 1956, respondent also disallowed entertainment expense of $37.46 claimed by the partnership for 1955 and a bad debt of $524.36 claimed by the partnership for 1956. The entertainment expense was disallowed for the same reasons that entertainment expenses were disallowed Service Games, Honolulu. Respondent disallowed the bad debt for failure to establish the right to the deduction. Jimmy & Ray Music Service was organized on or about March 1, 1953 and conducted a coin-operated amusement machine business within the Territory of Hawaii. Bromley, Humpert, and Bromberg, as first parties, selected, procured, and purchased coin-operated amusement machines and equipment which Raymond Cheong and Jimmy Sugiyama, as second parties, placed, serviced, and operated. Initially, Cheong and Sugiyama had only a one percent interest each, but in 1956 each had a 25 percent interest. The books and records of Jimmy & Ray Music Service included a depreciation register, invoices of vendors, sales invoices, and the depreciation expense reflected on the *64 partnership returns. An individual machine could be identified from these records as to the vendor, the cost, the date acquired, the depreciation taken on the machine, the sales price, and the date of sale. Jimmy & Ray Music Service dealt more with the music end of the amusement machine business than with pinballs. Music machines have a longer useful life with less salvage value than other machines. The partnership's accounting firm used a 3-year useful life for the partnership's music boxes and a 1-year useful life for its pinball machines, without salvage value. The books and records of Jimmy & Ray Music Service show acquisitions and sales of used coin-operated amusement machines with the depreciation expense on such machines for the calendar years 1953 through 1956, in dollar amounts, as follows: Depreciation Year
Acquisitions
Sales
expenses
1953
$152,264.05
$60,539.85
1954
60,689.42
$ 6,063.91
77,788.88
1955
28,033.95
15,880.33
65,554.36
1956
67,128.13
57,701.57
41,791.94
Among the coin-operated amusement machines acquired by Jimmy & Ray Music Service were 64 Maestro units from Service Games, Honolulu. Sixteen of these Maestro *65 units were acquired on March 10, 1953 for $8,957.99 (9 units at $559.87 and 7 units at $559.88); 24 units were acquired on August 28, 1953 for $6,000, or $250 each; and 24 units were acquired December 27, 1954 for $2,400, or $100 each, making the total cost of the 64 units $17,357.99. The books of Jimmy & Ray Music Service show that the 64 Maestro units were sold March 12, 1956 for $64,000, or $1,000 each, to Service Games, Inc., Panama. During the calendar years 1953 through 1956, Jimmy & Ray Music Service computed depreciation on the 64 Maestro units in the aggregate amount of $14,642.40, which left an undepreciated cost at March 12, 1956 of $2,715.59. The difference between the undepreciated cost and the selling price of the Maestro units, viz., $61,284.41, was reported as long-term capital gain on the partnership's 1956 return. The bank account of Service Games, Inc., Panama, shows a canceled check for $64,000 to Jimmy & Ray Music Service for the 64 units. The 64 units never left the place where they were stored in Honolulu. They ultimately completely deteriorated to scrap. On its 1956 partnership return, Jimmy & Ray Music Service claimed a deduction of $524.36 for a bad *66 debt. A prospective customer needed funds to open a restaurant. He borrowed an undisclosed sum from the Kaimuki Finance Company upon a note that Ray Cheong endorsed as managing partner of the partnership. The restaurant, known as Jiggs Cafe, paid some installments on the note and then defaulted. Thereafter, Jiggs Cafe went through bankruptcy, and the partnership had to make good on its endorsement by payment to the finance company. The balance due on the note plus interest was $524.36, which the partnership paid in 1956. Cheong tried to collect the balance due for several months before the partnership paid the note. After payment, Cheong continued his efforts for over two years without collecting a penny on the debt. Cheong reported these events to the partnership's accountants, who treated the $524.36 payment as a bad debt on the partnership return for 1956. On its partnership returns for the calendar years 1953, 1954, and 1956, Coast Cigarette Vendors, also known as Pacific Tobacco Company, reported ordinary net income of $40,769.87 for 1953, an ordinary net loss of $7,160.65 for 1954, and ordinary net income of $46,185.72 for 1956. Respondent determined that the correct ordinary *67 net income of the partnership for 1953, 1954, and 1956 was $47,807.89, $3,429.99, and $58,231.27, respectively. In so determining, he disallowed deductions for the following items and amounts for the reasons stated: Amounts Items
1953
1954
1956
Casualty loss - theft
$1,540.98 [1]
Entertainment expense
3,802.48 [2]
Bad debts
1,694.56 [1]
Miscellaneous and general expense
$ 1,983.05 [2]
Promotional expense
8,607.59 [2]
Noncompetitive agreement
$10,000.00 [2]
Promotion and entertainment
859.79 [2]
Unclassified expense
1,185.76 [2]
Total disallowed
$7,038.02
$10,590.64
$12,045.55
As a result of these adjustments, respondent determined that Bromley had understated his share of partnership income from Coast Cigarette Vendors by $1,759,50 in 1953, $2,647.67 in 1954, and $6,022.78 in 1956. (Bromley's share in 1953 and 1954 was one-fourth; in 1956 it was one-half.) Coast Cigarette Vendors, *68 a partnership, was organized in 1950 by Surber, Bromley, Humpert, and Bromberg, with each owning an equal interest therein. There was no written partnership agreement. The business was located at 206 Mokauea Street, Honolulu. In or about 1953, the partnership changed its name to Pacific Tobacco Company, which name will hereinafter be used. At all times material hereto Pacific Tobacco Company was engaged in the tobacco business, selling at retail and wholesale. It placed vending machines for retail sales in bars, restaurants, hotels, and night clubs, and in industrial location convenient to the public. It also operated one or two wholesale routes selling to small grocery stores and others who did not want vending machines. The partnership operated in Honolulu on the island of Oahu and occasionally sold cigarette machines on other islands in the Hawaiian group. In Honolulu the vending machines were serviced by route men in trucks, who supplied the machines with cigarettes and collected the cash from the sales. The route man started each day with a certain number of cigarettes which he accounted for at the end of the day with cash from sales or cigarettes returned. At times, the route *69 men sold a carton or cartons of cigarettes to a customer as a favor but such business was not solicited. In 1953, the partnership had four route men; in 1956, it had eight or nine. Prior to entering into partnership with petitioner, Humpert, and Bromberg, Curtis M. Surber was engaged in building a route of coin-operated machines and cigarette vending machines in Honolulu. After the partnership was formed, Surber managed and operated its routes and business, which the other partners financed. Humpert seldom visited the office; Bromberg lived in Los Angeles; and Bromley had little to do with operating the business while Surber was the managing partner. Surber devoted his full time and attention to the business and affairs of Pacific Tobacco Company. He supervised its employees, assistant managers, and route managers. He handled the partnership's bank account and its books through accountants who received regular reports from him on the business and affairs of the partnership. He was completely responsible for the day-today business operations of the partnership. On or about June 1, 1955, Surber employed an accounting firm to do bookkeeping, accounting, and tax work for Pacific *70 Tobacco Company. This firm continued to represent Pacific Tobacco Company until September 1957. Its services included bookkeeping, write-up work, preparing monthly statements, advising the partnership in accounting and tax matters, and preparing Federal and territorial partnership returns. Among the partnership returns prepared were the 1955 and 1956 income tax returns and amended income tax returns for earlier years including the taxable years 1953 and 1954. The accounting firm, and particularly John A. Baker, Jr., also did personal accounting for Surber and prepared tax returns for him. The accounting books and records of Pacific Tobacco Company included journals, general ledger, cash receipts books, and cash disbursements books. These books and records were used by the accounting firm in preparing the income tax returns of Pacific Tobacco Company. The tax returns reported gross receipts for the calendar years 1953 through 1956 of $677,284.49, $1,058,001.99, $854,610.97, and $784,055.51, respectively. The original income tax returns of Pacific Tobacco Company for 1953 and 1954 were prepared by another party and executed by Bromley for 1953 and Surber for 1954; the amended returns *71 were prepared by Baker and executed by Surber. In preparing these returns the accountant consulted with Surber and Bromley regarding certain items of expense, bad debts, and loss. One of the items discussed in preparing the 1953 return was "Casualty loss - theft" in the amount of $1,540.98. The book entries show these losses as being sustained during the months of February, May, June, July, August, and September 1953. They consisted of thefts of cigarettes from machines, thefts of machines (at their depreciated cost), and cash. A deduction of $1,694.56 for bad debt was claimed on the 1953 return. The books and records of Pacific Tobacco Company show that three accounts aggregating $1,694.56 were charged off the partnership books at December 31, 1953 as bad debts, and that this was the first time a bad debt deduction had been claimed by the partnership. The two principal debts charged off were from sales of cigarette machines, to Andrade's Honokau Store for $135 and to Arthur Wong for $1,464.56. The deduction of $3,802.48 for entertainment expense claimed by Pacific Tobacco Company in its 1953 return represented primarily checks drawn by Surber in favor of himself and co-signed *72 by Bromley, Humpert, or Bromberg. Usually, Surber cashed each check from money on hand in the partnership's safe, but if there was not enough money in the safe he cashed the check at the bank. Surber used part of the cash for entertainment and promotional expenses of the partnership. The promotional and entertainment account of Pacific Tobacco Company for 1953 shows 11 checks to Surber aggregating $3,131, checks to Liberty Jewelers and Advertiser Publisher Co. for $10.20 and $33, respectively, four entries relating to the distribution of packages of cigarettes for good will aggregating $328.28, and a check for $300 to "Service Games." The individual entries in this account, which total $3,802.48, are otherwise unexplained. Similarly, the promotional and advertising account of Pacific Tobacco Company for 1954 shows checks to Surber aggregating $5,626, various entries relating to the distribution of cigarettes for good-will purposes, and numerous other entries relating to checks issued for unexplained purposes. The expenditures of $8,607.59 charged to the account are not individually explained. In its 1954 return, Pacific Tobacco Company claimed a deduction of $1,983.05 for miscellaneous *73 and general expenses. The miscellaneous and general account on the partnership books shows entries each month, with 67 entries for the year aggregating $1,966.05. The expenditures reflected by the account are not individually explained. In August of 1955, the accountant filed amended returns for 1953 and 1954 for Pacific Tobacco Company but made no change in any of the deductions aforementioned. About the middle of December 1955, Baker conferred with Surber regarding the negative position of his capital account as a partner in Pacific Tobacco Company. Baker advised Surber that if he expected to deduct his share of the partnership's loss of $21,672.43 and his 1955 tax return he would have to get his capital account out of a deficit position. Surber accomplished this by borrowing $25,000 from Bromley on December 17, 1955. Surber's capital account in the partnership at the beginning and end of 1955 was ($11,012.66) and $1,258.21, respectively, with a capital contribution during the year of $25,000. At or about the time Bromley loaned Surber the $25,000, there were disagreements between them. Surber, Bromley, and Humpert discussed their disagreements on the day that Surber and his *74 wife and child departed for Texas to visit his wife's family. Bromley urged Surber to postpone his vacation trip but Surber refused. When Surber returned late in January 1956, his assistant had been made manager of the partnership, the combination of the office safe had been changed, and the other partners wanted him removed from the partnership. Surber and Bromley mutually agreed that the partnership was ended. Thereafter, a number of meetings were held between Bromley, Surber, and their representatives to settle their affairs. The sale of Surber's partnership interest and an agreement from Surber not to compete were among the matters discussed at these meetings. By March 1, 1956, the negotiations were completed, and the parties executed a bill of sale and an agreement on that date in Baker's office. The participants in these negotiations, in addition to Bromley and Surber, included Baker, Greenstein, an attorney representing Bromley, and Ashford, an attorney representing Baker and also Surber. Greenstein drafted the agreement after the first meeting of the parties. The bill of sale was drafted later by Greenstein or someone in his office. The tax implications of the sale of Surber's *75 partnership interest and of an agreement not to compete were discussed at these meetings, and Baker discussed these implications individually with Bromley and with Surber. At the March 1, 1956 meeting, Baker pointed out the advantages and disadvantages to each of the parties because, under the agreement, he was their escrow agent and he wanted each to know exactly what his tax situation was before he signed the agreement. By the bill of sale Surber transferred to petitioner and Irving Bromberg his entire interest in Pacific Tobacco Company and all its assets "for and in consideration of the sum of $10.00 and other good and valuable consideration to me in hand paid." Under the agreement, Surber covenanted and agreed that he would not compete in the Territory of Hawaii for a period of 3 years with petitioner and Bromberg, with the Pacific Tobacco Company, or with their coin-operated machine business which operated under the name and style of Service Games. Bromley and Bromberg agreed to pay Surber $36,000 (computed at $1,000 a month for 3 years), to be paid $12,000 with the execution of the agreement, covering the first 12 monthly payments, $12,000 one year later, covering the second *76 12 monthly payments, and $12,000 two years later, covering the final 12 monthly payments. The parties further covenanted and agreed that the good will of Pacific Tobacco Company had no value and that no value was assigned to good will in the transfer by bill of sale. And, finally, petitioner and Bromberg covenanted and agreed to indemnify and hold Surber harmless from any suits, liabilities, or obligations of Pacific Tobacco Company incurred or arising before or after execution of the agreement. Also on March 1, 1956, by letter addressed to Baker, Surber instructed Baker to collect the two $12,000 payments due him under the above agreement "and use the same to pay the balance of $24,000 due upon that certain note I signed December 17, 1955 in favor of M. J. Bromley." Inscribed on Surber's letter to Baker is the following statement: "I agree to waive the right to make demand on said note so long as payments are made in accordance with the above. [Signed] M. J. Bromley." Below Bromley's inscription appears the following statement: "I agree to comply with the foregoing instructions. [Signed] John A. Baker, Jr." On March 1, 1956, Surber deposited $15,008.21 in his personal account *77 at the Bank of Hawaii. This was the entire amount received by him on March 1, 1956 and consisted of the $12,000 paid upon execution of the agreement not to compete, $1,258.21, the credit balance in his partnership capital account, and $1,750 under the bill of sale. Thereafter, and in accordance with Surber's instructions, Baker collected the two $12,000 payments as they came due under the terms of the agreement and applied them in liquidation of the $24,000 balance due on Surber's note of December 17, 1955. Shortly after March 1, 1956, Surber moved from Hawaii to Texas. After executing the agreement not to compete, he did not engage in the tobacco or any other business in Hawaii. In its 1956 return, Pacific Tabacco Company claimed a deduction of $859.79 for promotion and entertainment expenses and a deduction of $1,185.76 for "Other deductions: unclassified." The promotion and entertainment account for 1956 on the partnership books shows 24 entries during the year, aggregating $859.79. The entries in the account name the payees of the checks listed therein, but the various expenditures are otherwise unexplained. The unclassified deduction of $1,185.76 on Pacific Tobacco Company's *78 1956 partnership return was composed of a number of accounts on the partnership books. These accounts and the explanations on the partnership books for some of the entries therein were as follows: Account #425, Bank Charges - $1.37; Account #430, Casualty Loss - $687.76 (consisting of 1956 cigarette losses per monthly report, $604.57, plus depreciated cost of machines stolen March 1 and July 1, 1956, $83.19); Account #485, Miscellaneous and General - $202.65 (includes 27 checks in addition to other entries); Account #450, Donations - $18 (consisting of checks to or for Seventh Day Adventists, Community Chest, Salvation Army, and Oahu T. B. Association); Account #455, Dues and Subscriptions - $73.50 (including Hawaii Restaurant and Dispensers Association, Western Tobacconists, Credit Bureau of Hawaii, and Honolulu Japanese Chamber of Commerce); Account #532, Medical - $744.52 (principally checks to Hawaii Medical Service) less amounts withheld from employees, $542.04, leaving a net amount of $202.48. The entries in these accounts are otherwise unexplained. For the calendar year 1956, Service Games, Guam, filed a partnership return with the Government of Guam which reported gross income *79 of $274,682.03, deductions of $299,370.97, an ordinarly loss of $24,688.94, and capital gains of $25,272.84. The loss and the capital gains were divided equally between the partners, Irving Bromberg and Martin J. Bromley. The partnership return has been accepted by the Government of Guam, as filed, without any change in the gross income or ordinary loss reflected in such return. On his 1956 tax return, Bromley reported his half of the capital gains, $12,636.42, and deducted his half of the ordinary loss, $12,344.47, as reported by Service Games, Guam. In determining the deficiency for 1956, respondent disallowed the loss deduction because "it has not been established that you sustained a loss from this partnership." Ultimate Findings of Fact The deposits in Honolulu banks during the taxable years in the names of Lemaire & Stewart, a partnership, and Service Games, Inc., Panama, a foreign corporation, belonged to the respective depositors, and Bromley's interest therein was as a signatory to the various bank accounts in a representative capacity. No part of the deficiency determined for each of the taxable years 1953 through 1956 was due to fraud with intent to evade tax, and *80 petitioners filed no false and fraudulent returns with intent to evade tax for these taxable years. The deficiencies determine against petitioner Martin Bromley for the taxable years 1953, 1954, and 1955 are not barred by the statute of limitations, but any deficiency determined against the petitioner Allyn Bromley for the year 1954 is barred by the statute of limitations. Opinion The issues in these consolidated cases, broadly stated, involve fraud, whether petitioner received large amounts of unreported income during each of the taxable years, the statute of limitations, and the amount of petitioner's distributive share of partnership income from various partnerships in which he was a member. Before taking up the issues separately, we will consider some of the general contentions of the parties. Petitioner contends that he was forced to petition for redeterminations upon what he calls "dummy" deficiency notices which give no reason or explanation for respondent's determination. The broad general allegations of the answer contain even less information on the disputed facts and issues. However, the allegations in respondent's answer with respect to fraud and the allegations *81 in his amendment to answer, fild in response to petitioner's motion for a further and better statement, explain the basis of respondent's determination as to the unreported income and the disallowed deductions for depreciation. We are satisfied that the pleadings as amended informed petitioner as to the bases of respondent's determinations. Accordingly, we reject petitioner's contention that "dummy" statutory notices of deficiency were issued for the taxable year. We also reject petitioner's contention that affirmative statements in the answer and amendment to the answer shifted the burden of proof as to the deficiencies from petitioner to respondent. Estate of Grace M. Scharf, 38 T.C. 15 (1962), affd 316 F. 2d 625 (C.A. 7, 1963). Insofar as these affirmative statements related to fraud, the parties agree that respondent has the burden of proof. Insofar as these affirmative statements were for the purpose of furnishing the petitioner with a further and better statement of respondent's reasons for determining that petitioner had unreported income and unallowable deductions, no new matter is involved which placed a burden on respondent. The burden of proof *82 was on petitioner to show error in respondent's determinations of deficiency. Rule 32, Tax Court Rules of Practice; Leonard B. Willits, 36 B.T.A. 294 (1937); Hoffman v. Commissioner, 298 F. 2d 784 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court. Not only does respondent rely upon the presumptive correctness of his determinations, but he also invokes the presumption that, since petitioner failed to appear or testify, presumably his testimony would be adverse to his contentions herein. Max Cohen, 9 T.C. 1156, 1162 (1947), affd. 176 F. 2d 394 (C.A. 10, 1949); O'Dwyer v. Commissioner, 266 F. 2d 575, 584 (C.A. 4, 1959), affirming 28 T.C. 698 (1957), certiorari denied 361 U.S. 862. Respondent points out that petitioner failed to furnish the Commissioner or this Court with his books and records. Accordingly, the deficiencies had to be determined from the best evidence available. He contends that the record shows that he, his agents, and his representatives carefully and fully considered all evidence available and obtainable in determining the deficiencies and additions to tax. *83 While it is true that petitioner's individual books and records were not produced in Court or made available to respondent, his agents or representatives, it is clear from the four deficiency notices herein that, except for the item of unreported income, all adjustments involved partnership income in which petitioner was a partner. Many of the books and records of these partnerships, and also of Service Games, Inc., Panama, were produced at the hearing. Schedules prepared from these books and records were offered and received in evidence at the hearing in Honolulu or Los Angeles, subject to respondent's right to check for accuracy. Thereafter, at a hearing in Washington, respondent objected to and moved to strike Exhibit 91, a schedule of yearly earnings of Service Games, Inc., Panama. Respondent's motion to strike Exhibit 91 was granted; no objection was made by respondent to any of the other schedules. One more general contention with respect to the unreported income issue should be mentioned. We are assuming respondent computed petitioner's unreported income by the so-called unexplained bank deposit method. This is none too clear in the broad allegations of respondent's pleadings, *84 [2] but the amounts determined for each year correspond fairly closely to the total deposits made in the bank accounts of Lemaire & Stewart, Service Games, Inc., Panama (including the Okinawa and Korea Divisions), John Raymond, Robert Mason, and Jeff Jerome. In his original brief, respondent refers to the "voluminous bank accounts, particularly those in the names of LeMaire & Stewart and Service Games, Inc. Panama" and a little later he points out complete books and records were not furnished and he then states: "The Commissioner therefore used the best evidence available, and determined the deficiencies upon the basis of the abovementioned large unexplained bank deposits, as fully shown by the requested findings, supra." The disturbing thing is that respondent makes no "requested finding" in the "supra" or Findings of Fact portion of his brief to the effect that the deposits in the Lemaire and Stewart bank account in 1953 constituted income to petitioner. And respondent makes *85 no specific argument with respect to this account until his reply brief. But without further comment on the pleadings and brief we will consider this as an unexplained bank deposit case as to the issue of unreported income. The Fraud and Unreported Income Issues We can consider the unreported income and fraud issues together since they are so interrelated that consideration of these issues separately would be repetitious. Respondent does make an argument that depreciation was claimed on Bromley's returns under circumstances which amounted to fraud. We will deal with this issue later. Respondent's theory, according to his opening statement and briefs, appears to be grounded upon the following factual determinations. During each taxable year Bromley derived and received large amounts of unreported income from his coin-operated machine business. Respondent measured this unreported income by the amounts deposited in certain bank accounts controlled by Bromley. The bank accounts owned or controlled by Bromley, according to respondent, were: the Lemaire & Stewart, Tokyo, Japan, account, the Service Games, Inc., Panama, account, the John Raymond account, and the Robert Mason account *86 with the Bishop National Bank of Hawaii at Honolulu; the Jeff Jerome account and the Service Games, Inc., Panama, Korea Division, account with the Liberty Bank of Honolulu; and the Service Games, Inc., Panama & Okinawa, account with the Bank of Hawaii. The evidence shows and we have found that the funds deposited in the John Raymond, Robert Mason, and Jeff Jerome bank accounts were held for the benefit of Service Games, Inc., Panama. Eventually all funds deposited in these three accounts were deposited in the bank account of Service Games, Inc., Panama, with no part thereof being paid to or for the benefit of Bromley. [3] This leaves the Lemaire & Stewart account and the various accounts of Service Games, Inc., Panama, as the sources of the unreported income determined by respondent. *87 The unexplained bank deposit method of computing income is a usual and acceptable method of reconstructing income. Percifield v. United States, 241 F. 2d 225 (C.A. 9, 1957); Morrison v. United States, 270 F. 2d 1 (C.A. 4, 1959), certiorari denied 361 U.S. 894; Louis Halle, 7 T.C. 245 (1946), affd. 175 F. 2d 500, certiorari denied 338 U.S. 949; Doll v. Glenn, 231 F. 2d 186 (C.A. 6, 1956); Hague Estate v. Commissioner, 132 F. 2d 775 (C.A. 2, 1943), affirming 45 B.T.A. 104 (1941), certiorari denied 318 U.S. 787; Joseph Calafato, 42 B.T.A. 881 (1940), affirmed per curiam 124 F. 2d 187 (C.A. 3, 1941); and Russell C. Mauch, 35 B.T.A. 617 (1937), affd. 113 F. 2d 555 (C.A. 3, 1940). Basically this method of reconstructing income is based upon the assumption that most of the assets a taxpayer receives in a year derive from a taxable source and, when this is not the fact, the taxpayer is in a position to explain. Accordingly, where a taxpayer makes frequent deposits in a bank account which he controls, and *88 the deposit items cannot be traced to any item of income reported in his returns, the evidence of the deposits supports the determination that they represent gross income received by the taxpayer in the year deposited. While the burden of proof in a fraud case is on respondent, he makes out a prima facie case of unreported income by showing bank deposits in bank accounts owned or controlled by the taxpayer that were not traceable to reported income. The burden is on the taxpayer to explain that said deposits were not of a taxable nature. Russell C. Mauch, supra; Louis Halle, supra.Deposits that are loans, or are transfers from one bank account of the taxpayer to another, or are otherwise explained as nontaxable income are to be subtracted from the total deposits. When the taxpayer does not meet his burden of refuting respondent's prima facie case, then the "irresistible inference" is that the deposits were items of unreported income fraudulently omitted from the taxpayer's income tax returns. Louis Halle, supra. Has respondent made out a prima facie case of fraud when he shows a bank account in the name or names of others than the taxpayers *89 and the fact that the taxpayer was a signatory in a representative capacity and the deposits therein were not traceable to the taxpayer's returns? We think not. Respondent's witness, the banker, testified that as to the Lemaire and Stewart account the bank would consider Lemaire and Stewart the bank's customers and Bromley the signatory. The account in the name of Service Games, Inc., Panama, was ostensibly owned by an entity and not the officer who signed for the entity. Respondent does not make out a prima facie case of fraud by merely showing the existence of these accounts. No burden to explain those accounts in order to avoid a finding of fraud was cast on the taxpayer by the mere evidence that his signature in a representative capacity could accomplish withdrawals. It would take other evidence tending to show petitioner's ownership of the accounts in his individual capacity before it could be said respondent made out his burden of establishing fraud. It is enough to say respondent introduced no evidence that would justify a determination that petitioner owned the accounts in his individual capacity. This disposes of the fraud issue with respect to unreported income but the *90 correctness of respondent's determination of unreported income remains. Respondent seems to rely upon the presumption of correctness of his determinations. As will later appear, we do not uphold petitioner's contention as to the statute of limitations. Respondent is right when he says his determination of deficiencies for each of the years involved is presumptively correct. But this presumption vanishes and petitioner makes out a prima facie defense to the determination when he produces the partnership and corporate entities and their testimony that they own the accounts outstanding in their names and substantial business activities performed by the entities. There seems to be no doubt that there actually was a partnership of Lemaire and Stewart in Tokyo in 1953. Lemaire and Stewart testified they formed this partnership to enter the coin-operated machine business upon their moving to Tokyo in 1952. Petitioner produced much more than the testimony of the partners and the corporate officers that the accounts standing in the names of the partnership and the corporation were owned by those entities. Lemaire and Stewart testified that Bromley represented them in purchasing coin-operated *91 amusement machines, parts, and equipment. The partnership transferred its funds to Honolulu to make the purchases. Their supplies were located in Honolulu and the United States. Over $218,000 of these deposited funds were used during 1953 to purchase coin-operated machines and parts for Lemaire & Stewart from the Irving Bromberg Co. Another $52,025 of such funds were accounted for by respondent's Exhibit G, which consisted of six certified checks. Since no explanation was offered by either party as to these checks, which were stipulated into evidence, no findings were made with respect thereto. We note, however, that five checks aggregating $44,500 were to the Ming Tak Bank, located in Hong Kong, and each indicated in the lower left-hand corner that it was issued for the purchase of yen. The sixth check, issued to Stanley A. Kettler for $7,525, carried the following notation in the lower left-hand corner, "43 Brand New Slot Machines." Each certified check bore the signature of "M. J. Bromley," preceded by the typed signature "Lemaire & Stewart, Tokyo, Japan," and followed by the typed signature "Trustee." We hold petitioner sustained his burden of showing that the account was not *92 the property of petitioner and therefore the determination of deficiency in 1953 based upon unreported income measured by the deposits in the Lemaire and Stewart bank account was error. There is even more evidence to support petitioner's contention that he did not own the bank account standing in the name of Service Games, Inc., Panama. Since the cash deposited by Service Games, Inc., Panama, for the period December 2, 1953 to December 31, 1956, inclusive, aggregated $2,974,777.37, obviously the major portion of petitioner's unreported income for the taxable years was determined to have been derived from this source. On brief, respondent justified this portion of his determination upon the ground that Service Games, Inc., Panama, was a dummy or sham corporation without substance. [4] In support of his position that Bromley's operations represented a consolidated business venture, respondent claims that Bromley hired Stewart, then a Services Games, Honolulu, route man, and sent him to Japan to carry on this business in 1952, and in 1954 identified Stewart as "his manager in Japan." He claims that there were no permanent corporate books of account, except a check register kept at *93 Honolulu, and that, although the corporation had accumulated earnings, it had no other assets, inventory, or office furniture. He points out that Bromberg, the corporate president, had nothing to do with the books, knew nothing about a Japan corporation, and was uncertain about the corporate minutes. He also points out that Humpert put $2,000 into the corporation in 1953 and sold out for the same amount in 1955, that Humpert was unfamiliar with the corporation's business, and that he did not think the amount of its business "was anything to get excited about." He dismisses the testimony of Stewart and Lemaire as being completely false, and argues that their statements cannot be accepted in any respect. He contends that profits were deposited in the Honolulu bank account of Service Games, Inc., Panama, on which Bromley was authorized to sign. He claims that Bromley checked against and withdrew large amounts of money therefrom on numerous occasions and admitted to revenue agents that the surplus was reinvested. He argues that this dummy corporation was a further elaborately attempted device by which Bromley sought to create a no man's land free from Federal taxes. Among other cases, *94 respondent relies particularly upon Factor v. Commissioner, 281 F. 2d 100, affirming a Memorandum Opinion of this Court, and Jesse E. Hall, Sr., 32 T.C. 390 (1959), affd. 294 F.2d 82 (C.A. 5, 1961).
Petitioner contends that Service Games, Inc., Panama, was organized under the laws of Panama as a separate corporate entity, that it conducted its business operations entirely outside of the United States, and that no part of its earnings resulted *95 from business operations within the United States. At the hearing petitioner continuously objected to evidence relating to the source, size, and taxability of the corporation's income upon the ground of relevancy. Petitioner's motion to strike such evidence was taken under advisement. On brief, petitioner renewed and pressed his motion to strike all evidence adduced by respondent relating to earnings, the source of income, the bank accounts, deposit slips, and cancelled checks of Service Games, Inc., Panama. Full consideration having been given to petitioner's motion to strike, we conclude and hold that such motion should be and is hereby denied. The record and our findings support petitioner's position on the validity of the corporation. Service Games, Inc., Panama, was incorporated under the laws of Panama in September 1953 and thereafter continued to be a Panamanian corporation. It was organized for the purpose of conducting a coin-operated amusement machine business in the Far East and elsewhere. It entered into a contract with Japan Service Games, also known as Lemaire & Stewart, to represent it in Japan for a period of five years. Stewart, as vice-president and general manager, *96 and Lemaire, as vice-president and assistant general manager, managed, directed and developed the corporation's business and activities in Japan and the Far East. The day-to-day activities of Stewart and Lemaire included buying, selling, leasing, maintaining, and servicing all the different types of coin-operated amusement machines used in the business. An important source of business was the numerous officers clubs and open messes on United States military installations in Japan, Okinawa, Korea, and elsewhere in the Far East. These clubs and open messes used all types of coin-operated amusement machines, some of which were purchased outright, while others were leased on a varying percentage basis. The extent of Stewart's and Lemaire's business activities during the taxable years, whether they were corporate officers or Bromley's employees, can be partially measured by the dollars transmitted from Japan and the Far East for deposit in a Honolulu bank, viz., $2,974,777.37. Even the respondent, in arguing for his theory of the case, states, on brief, that the evidence clearly shows that Bromley's business activities in Japan and other Pacific island locations were "unusually successful. *97 " Undoubtedly, the attorneys employed by Stewart and Lemaire in Tokyo recommended incorporation in Panama for the purpose of gaining an advantage under the laws of that country. Service Games, Inc., Panama, was in fact organized and has continued to exist under the laws of Panama. The fact that the corporation operated initially in Japan and the Far East does not detract from the validity of its formation or its continued existence. Since incorporation was followed by the carrying on of business by the Panama corporation, it was a separate entity. Moline Properties v. Commissioner, 319 U.S. 436 (1943); Columbian Rope Company, 42 T.C. 800. Respondent cites Aldon Homes, Inc., 33 T.C. 582 (1959), and Shaw Construction Co., 35 T.C. 1102 (1961), affd. 323 F. 2d 316 (C.A. 9, 1963). Both of these cases involved multiple corporations engaged in residential developments. In each case we held that the multiple corporations were not organized for any substantial business purpose, did not actually engage in substantial business activity, and, though legal in form, were organized primarily to obtain tax benefits. We held that *98 these multiple corporations "were unreal and shams and are to be disregarded for tax purposes." Shaw Construction Co., supra, p. 1114. The present facts are distinguishable from the two cited cases, particularly with respect to the purpose of incorporation and the volume of business transacted after incorporation. Admittedly, the courts have looked many times through the form to the substance of transactions in fixing tax liabilities. This was done in the two cited cases. While we recognize the rule, we do not agree that the two cited cases are precedents for invoking the rule here. Respondent contends that his position on the merits and on most of the issues presented herein is directly and strongly supported by the Factor case, supra. There are material factual differences between the Factor case and the instant cases. In Factor we found that the taxpayer practically admitted that he was the sole owner of all three organizations (two Canadian corporations and a London, England, partnership), that he operated them, and that he owned all of the income of the three organizations. There is no admission of such ownership here. On the contrary, it is established that petitioner *99 had no proprietary interest in the Tokyo partnership of Lemaire & Stewart and he was only a minority stockholder in Service Games, Inc., Panama. Stewart and Lemaire were not employees of petitioner. Bromley did not hire salesmen for Lemaire & Stewart, dominate and/or control that partnership's activities, or own the partnership's assets and income, as was the case in Factor, supra.Bromley's employees were not the officers and directors of Service Games, Inc., Panama, nor was he the owner, beneficial or otherwise, of all its capital stock, which situation existed between Factor and the Canadian corporations. Furthermore, Bromley reported a large taxable income and paid the tax thereon for each of the taxable years, whereas Factor deliberately concealed his income by reporting no taxable income for 1935 and a loss for 1936. In our opinion, the Factor case is readily distinguishable from the instant cases. Respondent argues the depositions of Stewart and Lemaire should be ignored because they gave false answers to interrogatories asking (1) whether they had ever acted for Bromley in connection with purchases and sales of Japanese yen - they said they had not - and (2) *100 whether they had been paid $25,000 a year by Service Games, Inc., Panama, for their services outside of Japan - they said they had. We are not sure the answers were false. The other evidence of yen transactions shows the parties Bromley and Stewart and Lemaire were acting as corporation officers. Such evidence does not show their answers to the interrogatory false. And the corporate records and other evidence does not clearly show they did not receive the $25,000 salary for services for the corporation performed outside Japan. We do not think the depositions can be ignored. Hundreds of invoices, telegrams, purchase orders, telegraphic transfers, and billings, plus "Service Games" accounts from the books of manufacturers and suppliers of coin-operated amusement machines were introduced in evidence. Most of these documents showed an address of 210 Mokauea Street, Honolulu, regardless of the entity named. Some showed differences in the names of the entity used. Some telegrams were signed "Bromley" as though he were acting individually. The billings and the account headings of the suppliers were inconsistent sometimes with the purchase order or telegram. Respondent relies on these discrepancies *101 to buttress his argument that Bromley operated individually and the corporation was a "smokescreen." We have carefully weighed, considered, and analyzed these documents, the testimony respecting them, and the explanations offered. We are satisfied that machines and parts shipped to Japan and the Far East generally were Service Games, Inc., Panama, transactions and that shipments to Honolulu generally were for the partnership Service Games, Honolulu. For completeness, we point out that the accountants testified that the records were not confusing and that they were able to trace the various transactions to the participating entity. The voluminous evidence in this record, analyzing the two bank accounts, tracing deposits and expenditures, and the accountants' testimony analyzing books, records, and invoices, especially of Service Games, Inc., Panama, serves to corroborate the testimony of the partners and corporate officers that the entities owned the bank accounts standing in their names. We hold petitioner sustained his burden of showing he did not own the bank accounts used by respondent to determine unreported income. Depreciation with Respect to Fraud Issue Respondent also *102 charges fraud with respect to the depreciation deductions claimed on the partnership returns of Service Games, Honolulu, and Jimmy & Ray Music Service. The statutory notices of deficiency state that the depreciation deductions were disallowed because it had not been established that "any deduction for depreciation is allowable." In his amended answer respondent alleged fraud with respect to excessive depreciation deductions which were disallowed because he refused to recognize the transfers of machines between different operating entities of the petitioner at fictitious and inflated values and prices. By virtue of this affirmative allegation, respondent has the burden upon the fraud issue of showing that the transfers of machines were between different operating entities of petitioner and that such transfers were at fictitious and inflated values and prices. The only evidence of values and prices are the depreciation work sheets of petitioner's accounting firm and the schedules attached to the partnership returns. The members of the two partnerships and their interests therein varied from time to time during the taxable year but there is no doubt on this record that Ray Cheong was *103 the managing partner of Jimmy & Ray Music Service or that Bromley was the managing partner of Service Games, Honolulu. We have rejected respondent's theory that Bromley operated a consolidated business venture, and on the proof here we hold that there is no basis for a determination that these transfers were between different operating entities of the petitioner. We find and hold that they were separate and distinct entities and that the transfers, on this record, were valid and bona fide. The record also shows that the depreciation records were kept by a reputable accounting firm which prepared the income tax returns for the partnerships. Later, these records and the returns were audited and checked by another accounting firm. The latter firm prepared schedules from the books and records of the partnerships which supported the depreciation deductions claimed on the partnership returns. The books and records were in the court room and respondent was given opportunity after the taking of evidence had been completed and before trial was concluded to question their accuracy, but he raised no objection thereto. While respondent's amended answer charges the partnerships with claiming *104 excessive depreciation and refuses to recognize transfers of machines between the business entities, the principal transfers referred to on brief are those relating to the 64 Maestro machines. The record shows that Jimmy & Ray Music Service acquired these machines from Service Games, Honolulu, on March 10, 1953 (16 units), August 28, 1953 (24 units), and December 27, 1954 (24 units). The total cost of the 64 units was $17,357.99. Jimmy & Ray sold them on March 12, 1956 to Service Games, Inc., Panama, for $64,000. During the period of time that Jimmy & Ray used these 64 units it claimed depreciation in the aggregate amount of $14,642.40. At the date of sale the undepreciated cost of the 64 units was $2,715.59. The partnership reported the difference between the selling price and the undepreciated cost, viz., $61,284.41, as long-term capital gain on its 1956 return. The depreciation records of Service Games, Honolulu, show that this partnership bought 16 Maestro units on February 16, 1953 for $8,652.01 and that the salvage value thereof was $2,163.01 and the depreciable value was $6,489. On March 10, 1953, Service Games sold these 16 units and its records show depreciation thereon *105 of only $270.39. These records also show that the partnership bought 24 Maestro units on July 20, 1953 for $6,000, sold them August 28, 1953 for $6,000, computed current depreciation at $187.44, and showed a short-term gain from the sale of $187.44. Respondent's exhibit BA failed to include the depreciation records of Service Games for the fiscal year ending June 30, 1955, so that we are uninformed as to the depreciation claimed on the other 24 units. But, insofar as the depreciation of the 40 units is concerned, there is no basis for respondent's contention that excessive depreciation was claimed thereon or fictitious and inflated values and prices used. In addition, respondent calls attention to the evidence of record as to depreciation and selling prices of 2 Shuffle Alley machines, 3 Ice Frolics machines, and a Wurlitzer Model 1015. After largely or fully depreciating these machines, Service Games, Honolulu, sold them to Jimmy & Ray Music Service during the taxable years. The machines were then depreciated by Jimmy & Ray Music Service upon the basis of their costs. Thereafter the latter sold the 2 Shuffle Alley and the 3 Ice Frolics machines. Respondent points out that the total *106 recovery (depreciation plus selling prices) far exceeded their original cost, [5] which, he contends, proves that petitioner's books, returns, and schedules are not correct and without more complete books and records it is impossible to make any more accurate determination of depreciation deductions. As stated, the depreciation deductions were supported by the books and records kept by apparently competent accountants. The amounts do not appear to us to be unreasonable or execessive and no one testified to that effect. We are satisfied that respondent *107 has failed to prove fraud with respect to the depreciation claimed, and we so hold. Statute of Limitations Issue The bar of the statute of limitations was pleaded by petitioner with respect to the deficiencies for the taxable years 1953, 1954 and 1955. The question as to 1955 can be answered quickly. Petitioner evidently overlooked the fact that a consent or waiver was executed and filed with respondent on April 7, 1959, which extended the period of limitations to December 31, 1959. The statutory notice for 1955 having been issued before the period of limitations as extended had expired, the 3-year statutory bar of section 6501(a), Internal Revenue Code of 1954, is inapplicable. Petitioner contends that assessment and collection of the deficiencies determined for 1953 and 1954 are barred because no valid consents extended the period of limitations beyond June 30, 1959, whereas the statutory notices of deficiency were issued on November 6, 1959. He contends that there was no written agreement which was duly executed by "both the Secretary or his delegate and the taxpayer," (as prescribed by section 6501(c)(4), Internal Revenue Code *108 of 1954) extending the time for assessment beyond June 30, 1959. Our findings show that petitioner intervened in an action by Special Agent Black to enforce obedience to a summons against the partnership's accountant, K. J. Luke. Upon appeal from the order of the United States District Court to the Court of Appeals for the Ninth Circuit, Reisman for petitioner and Baum for Black, as counsel of record, signed a stipulation on June 5, 1959, the terms of which were incorporated in an order of the Court of Appeals dated June 15, 1959. The period of limitations for the taxable years 1953 and 1954, as extended, expired on June 30, 1959. If the stipulation of counsel and the order of the Ninth Circuit failed to extend the period of limitations beyond June 30, 1959, the deficiencies for 1953 and 1954 are barred because the first court order thereafter was issued on October 13, 1959. The deficiency notices were issued within the following 30 days, namely, November 6, 1959. Reisman appeared as Bromley's attorney before the United States District Court for Hawaii and the Court of Appeals for the Ninth Circuit. He signed the said stipulation as the counsel of record for Bromley. The stipulation *109 by the parties was the basis for the order entered by the Ninth Circuit remanding the case to the United States District Court. The Ninth Circuit and opposing counsel have the right to rely upon Reisman's stipulation and the admissions therein. In agreeing to the stipulation, Reisman acted in the place of Bromley. Reisman's acts and admissions are to be treated as those of Bromley. Furthermore, there was a motion filed by Bromley on September 11, 1959 in the United States District Court for the District of Hawaii, asking the District Court(a) to dismiss the proceedings because Black had failed to comply with the order of the Ninth Circuit (filed with the District Court on June 16, 1959) and (b) to require the clerk of the court to surrender "unto Martin J. Bromley, taxpayer, all papers, records, files, documents and books now retained in his custody and possession." Bromley based his motion upon the record and proceedings before the United States District Court for the District of Hawaii, the order of the Ninth Circuit, and the affidavit of counsel attached to the motion. Counsel's affidavit contains the following statement: "That in the proceedings before said Court of Appeals, said *110 taxpayer has waived the benefits of the statute of limitations on all possible claims of the United States for a period of 30 days following a final order herein." It was after this that the Court, on October 13, 1959, entered its final order in the case. Petitioner also contends that the stipulation was not validly signed and accepted by a duly designated delegate of the Secretary of the Treasury. His theory here is that the Assistant United States Attorney in Honolulu who executed the stipulation as "attorney for Special Agent Black" was not shown to be a duly designated delegate of the Secretary and therefore his execution of the stipulation was ineffective to waive the statute of limitations. When Bromley instituted legal proceedings against Black, the United States Attorney was required by law to appear and defend Black's actions.[6] And, when the stipulation was signed in the appeal to the Ninth Circuit, it was Black's attorney who signed for him, even as Reisman signed for Bromley. Black, individually, was not the party before the Ninth Circuit; Black was before the court in his administrative and official capacity as delegate of the Secretary of the Treasury. The signature *111 of his attorney on the stipulation was binding on Black as the duly designated delegate of the Secretary and was so accepted by the Ninth Circuit and by Bromley until the question was raised in the instant case. R. H. Stearns Co. v. United States, 291 U.S. 54 (1934), at p. 62.
Petitioner's alternative contention is that the order of the Ninth Circuit was the final order. Since more than 30 days elapsed between the date of that order, June 15, 1959, and the issuance of the deficiency notice on November 6, 1959, petitioner contends that the period of limitations had expired even though the stipulation was valid. This argument is refuted by petitioner's motion for dismissal of the proceeding filed on September 11, 1959 in the United States District Court and the affidavit of counsel attached thereto. At the time the affidavit was made, more than 30 days had elapsed from the time the Ninth Circuit had entered its order, yet petitioner was seeking a dismissal in the United States District Court because Black had failed to proceed further in accordance with the remand. We attach no importance to the statement *112 that the proceeding was dismissed upon oral motion by the United States Attorney without objection by petitioner, since he had a motion to dismiss on file with that court. Full consideration having been given to the various contentions and questions raised by petitioner with respect to the statute of limitations, it is our opinion that the deficiencies determined by the respondent against the petitioner Martin Bromley for the taxable years 1953, 1954, and 1955 are not barred by the statute of limitations, and we so hold. We do hold, however, the deficiency determined against the petitioner Allyn Bromley was barred for the year 1954. She was not a party to the foregoing litigation with Agent Black. The stipulation and orders entered thereon, which we have held constitute waivers as to petitioner Martin Bromley, do not furnish support for respondent's contention that the bar of the statute was lifted as to her for the year 1954. We hold any determination of deficiency against Allyn Bromley for the year 1954 was barred by the statute of limitations. The bar of the deficiency determination for the year 1953 against Allyn Bromley would not be lifted for the same reason, i.e., that she *113 was not a party to the litigation with Black. However, the 1953 determination against Allyn is not barred for another reason. She fails to prove she filed a valid return for that year. It takes the filing of a return signed by her or by her qualified agent to start the running of the statute of limitations, sec. 6011, Internal Revenue Code of 1954; sec. 1.6011-1, Income Tax Regs. The burden was on petitioner Allyn Bromley on the issue. Louis Halle, supra. It is admitted Irving Bromberg signed her name to the 1953 income tax return. She did not testify and there is no evidence at all that Bromberg was ever her agent with respect to this 1953 return. She fails to meet her burden of showing any 1953 deficiency was barred by the statute. We have already held the bar of the statute for 1953 as to Martin Bromley has been lifted because of the stipulation in his litigation with Agent Black. Another reason for the same conclusion would be his failure to show the filing of a valid 1953 return to start the running of the statutory period. The record shows Bromberg signed Bromley's name to the return; that Bromberg testified: "Martin Bromley *114 might have been out of the country at the time"; and that he had had a power of attorney from Bromley to sign for him, which instrument he could not find. Bromley did not testify. Without further comment we hold such evidence is completely inadequate to establish Bromberg as Bromley's agent with respect to making a 1953 return for Bromley. Depreciation Deductions There has been some discussion of depreciation with respect to the fraud issue. There the burden was on respondent but here he is aided by the presumption of correctness of his determination. Again we experience some difficulty in pinpointing respondent's contention with respect to the disallowed depreciation deductions. His opening statement and the argument in his brief leave us with doubts as to his exact stand on the depreciation issue. As pointed out earlier, respondent, in his notices of deficiencies, disallowed all deductions for depreciation of coin-operated machines claimed on the partnership returns of Service Games, Honolulu, and Jimmy & Ray Music Service. The reason given in said notices was because "it has not been established that any deduction for depreciation is allowable." Respondent's argument on brief *115 seems to be that his determination is presumptively correct and petitioner failed to sustain his burden of showing it was not. Just what was the burden cast upon petitioner on this depreciation issue? We need not consider the broad reason stated in the notices of deficiencies alone. In response to petitioner's motions for further and better statement respondent amended his answer in these dockets and alleged his depreciation adjustment is chiefly based upon his "disallowance of excessive depreciation deductions because of the respondent's nonrecognition of alleged sales of equipment between different operating entities of the petitioners at fictitious and inflated values and prices." The best we can do when we try to relate respondent's above pleading to the depreciation disallowance is say that it is respondent's position that petitioner took excessive depreciation deductions because (a) the different partnerships were all one business with different "operating entities" (presumably in the sense of business branches) [7] owned by petitioner and therefore sales of coin-operated machines between the partnerships were not to be recognized and such so-called sales would not give rise *116 to new depreciation by the so-called buying partnership, and (b) the sales of coin-operated machines between the partnerships were at such fictitious and inflated values and prices that they are not to be recognized as sales at all. This means it was petitioner's first burden to establish that the partnerships - Service Games, Honolulu, and Jimmy & Ray Music Service - were separate entities and not merely parts or branches of a business owned by petitioner. Service Games, Inc., Panama, is not here involved even though the record shows all three partnerships sold coin-operated machines to it. And Bromberg Co. is not really involved except that it usually made the first sales of the new machines to the other two partnerships. Respondent's adjustment is confined to the depreciation taken by Service Games, Honolulu, and Jimmy & Ray Music Service. Petitioner sustained his burden of showing the partnerships were separate *117 entities. All of the evidence establishes without question that petitioner owned a one-third interest in Service Games, Honolulu, and less than a one-third interest in Jimmy & Ray Music Service up until Humpert sold out in 1955 and thereafter a one-half interest in Service Games, Honolulu, and less than that in Jimmy & Ray Music Service. Indeed, respondent's adjustment of petitioner's income recognizes his minority interest in the partnerships. Respondent does not even argue on brief that the partnership entities were parts of a single business owned by petitioner. Petitioner argues he met any further burden by the stipulated exhibits of the accountants who kept the records of each partnership and other evidence. These exhibits are some 80 sheets, apparently tracing the history of hundreds of coin-operated machines from date of acquisition by each partnership to ultimate disposition, showing cost, depreciation taken, where sold, the sale price, and the name of the purchaser. The accountants testified these exhibits substantiate the depreciation deductions taken on the various income tax returns. Respondent seems to admit the exhibits "are in accordance with the returns." Respondent *118 seems to concede now that the coin-operated machines would be depreciable assets when used by the partnerships at various locations to produce revenue. And his agent testified that a useful life of 1 year for pinball machines and 3 years for music machines (the periods used by the accountants here) had been sanctioned in his prior audit of the partnership. Respondent seems to argue (1) that his determination casts upon petitioner some further burden to show the sales of coin-operated machines between the partnerships were all bona fide and not at inflated values and prices and petitioner did not sustain this burden, and (2) that the mere fact that the exhibits show depreciation taken by both partnerships plus sales price for some coin-operated machines which were sold by one partnership to the other far exceeds the original cost of its first acquisition, shows the sales were at "fictitious and inflated values and prices." [8]
Our general observation with respect to respondent's *119 "fictitious and inflated values and prices" argument is that we can see no incentive in transactions between the two partnerships to inflate prices. Because the same persons own more than 80 percent capital interests in the two partnerships, the gains would be ordinary income. Sec. 707, Internal Revenue Code of 1954. We cannot agree with respondent's first proposition. Neither respondent's determination nor the explanatory statements in his amended answer cast upon petitioner the burden of showing each and every sale of a coin-operated machine by one partnership to the other was at a fair market value or not at an inflated value or price. Ordinarily depreciation is computed upon cost and not at fair price or fair market value. We do not understand respondent to argue that the machines that were recorded as sold were not actually transferred or the prices that were recorded were not actually paid by the buyer partnership to the seller partnership. We have here two partnerships with 80 pages of their accountants' records showing the purchases and sales of several hundred coin-operated machines on various dates during the four-year period here involved. Petitioner *120 had no burden to establish that every recorded sale was for some fair price. We do not mean to hold that a taxpayer would never have the burden to establish the bona fides of a sale on a disallowance of depreciation deduction. When the disallowance is specifically directed, the burden might well be on the taxpayer to establish the sale price had some reasonable relationship to actual value. But that is not the situation here. Likewise we cannot agree with what appears to be respondent's second argument: that the mere fact the total depreciation taken on coin-operated machines by buyer and seller partnerships, plus sales prices, will in many instances exceed the original cost of the machine by the first acquiring partnership, establishes that depreciation deductions were, as respondent says, "overworked," or that the sales prices were at inflated values and prices. The separateness of the entities is recognized. The reality of the sales in the sense that the property changed hands and the sales prices were paid, is also recognized. An inflated sales price is not established by showing the total depreciation taken by two or more owners plus sales price exceeds the cost to the first *121 owner. Because it happened often here, that fact might be some indication that too short a useful life was being used, but that argument is not made and the period used had received approval by respondent's agents. We agree with petitioner that respondent erred when he refused to allow the partnerships any deduction whatsoever for depreciation on their coin-operated machines. The evidence is convincing that each partnership purchased and used coin-operated machines in its business. The evidence establishes the cost of the machines listed and a useful life of 1 year for pinballs and 3 years for music machines. But we are unable to distinguish between the machines that were used in the business and those that were held primarily for sale, particularly as to Service Games, Honolulu. We also find on examination of the accountants' records for Jimmy & Ray Music Service that no salvage value was used in computing the depreciation deduction for some of the years here involved. Convinced as we are that the partnerships are entitled to a deduction for depreciation in some amount for each year, we must make as close an approximation as we can under Cohan v. Commissioner, 39 F. 2d 540 *122 (C.A. 2, 1930). After a full and careful consideration of the entire record and in the exercise of our best judgment, we have concluded that Jimmy & Ray Music Service is entitled to 50 percent of the depreciation deductions claimed on its returns and Service Games, Honolulu, is entitled to 25 percent of the depreciation deductions claimed on its returns. In so concluding, we have weighed and considered, among other things, the type of business of each partnership, their purchases and sales, whether their machines were held primarily for use in the business or for sale to customers, whether sales by one partnership to the other were bona fide, the failure of Jimmy & Ray Music Service to use a salvage or scrap value, and the failure of Bromley to testify. Respondent's disallowance of depreciation deductions for the partnerships' years of 1953, 1954, and 1955 resulted in adjustments of capital gains as reported by the partnerships. No reason is given by respondent for the capital gain adjustments in these taxable years other than the disallowance of depreciation deductions. In view of our determination on the depreciation issue for the above taxable years, the adjustments of the partnerships' *123 capital gains should be recomputed. For 1956 respondent determined that the partnerships received the proceeds reported as capital gains but determined that the aggregate reported was ordinary income because it had not been shown that the proceeds were from the sale or exchange of capital assets. Petitioner has the burden of showing that the assets sold were capital assets entitled to capital gain treatment. This he has failed to do. In fact, he makes no claim or statement specifically with respect to respondent's determination that the proceeds from these 1956 sales were ordinary income. On this item, we affirm respondent's determination. Partnership Deductions: Entertainment, Travel, and General Expenses, Service Games, Honolulu For each of the taxable years respondent increased petitioner's share of partnership income by disallowing deductions for entertainment and travel expenses on the fiscal year partnership returns of Service Games, Honolulu, and by disallowing a deduction for general expenses on the fiscal year return of that partnership for the year ended June 30, 1956. The amounts of the deductions claimed by the partnership for each year are stated in our findings. *124 Respondent explained his denial of the deductions in his statutory notices of deficiency as being based upon three grounds, viz., it has not been established: (1) that the expenditures were in fact made; (2) if made, that they constituted ordinary and necessary expenses; and (3) that the amounts were expended for the purposes designated. Petitioner has the burden of proving that the partnership is entitled to the deductions disallowed by the respondent. He contends that respondent's action was arbitrary and erroneous, that the expenses were incurred and the amounts expended in the ordinary course of business, that the deductions are reasonable in size, and that the expenditures are supported by vouchers, records, and schedules which respondent could check and bring any discrepancy to the attention of the Court. He also contends that the books were kept by competent accountants in the regular course of business. The facts show that Bromley was the managing partner of Service Games, Honolulu. He knew more about the operation of the partnership and its expenditures than any other person. If he had testified, undoubtedly he could have explained many of the entertainment, travel, and *125 general expense items and their relationship to the business operations of the partnership. If the partnership is to secure a tax benefit by way of deductions for these expenditures someone with personal knowledge must identify and establish them as proper business expenses. A schedule of partnership checks listed by number, date, payee, and amount, as charged to the three accounts on the partnership books, does not prove that the expenditure was ordinary and necessary or that it had a business purpose. The schedule shows how the staff of the accounting firm treated and characterized the disbursements on the partnership's books, but it does not prove the deductibility of the expenditures. Absent such proof, the determination of the respondent with respect to these deductions is approved. Partnership Deductions: Entertainment Expense and Bad Debt, Jimmy & Ray Music Service On its 1955 partnership return Jimmy & Ray Music Service deducted $37.46 for entertainment expense. Respondent disallowed the deduction, which placed the burden on petitioner to substantiate the deduction. There is no identification or explanation of this expense item in the record. Respondent's disallowance *126 of the deduction is affirmed for failure of proof. On its 1956 return Jimmy & Ray Music Service deducted $524.36 for a bad debt, which respondent disallowed. The circumstances which created the debt were related by Cheong. As managing partner he endorsed a note to a finance company for a prospective customer to assist the latter in opening a restaurant. After paying some installments on the note the customer defaulted and went through bankruptcy. The finance company demanded payment from the partnership on its endorsement. In 1956 the partnership paid the finance company the balance of $524.36 due on the note. Cheong testified that he attempted to collect the balance before and after the partnership had to pay but without success, and that, after relating these facts to their accountants, the latter charged off the amount as a bad debt. Cheong's testimony as to payment is corroborated by a schedule prepared from the partnership's books and records which shows that check number 2950 was issued by the partnership to Kaimuki Finance Company to satisfy its liability under the endorsement. Assuming the credibility of Cheong's testimony, it is insufficient to establish the worthlessness *127 of the debt in 1956. The note was not produced so we are uninformed as to its terms, its amount, or its maker. We do not know when the default occurred or what caused it. Upon paying the balance of the note the partnership became entitled to whatever rights the finance company had by subrogation. What the situation of the debtor was at that time has not been established. If the debtor was insolvent or bankrupt when the partnership made good on its endorsement, the debt was worthless when acquired and would be deductibtle. Warren Leslie, Sr., 6 T.C. 488 (1946). Cheong testified that the restaurant became bankrupt but he did not relate the bankruptcy in time to the partnership's payment of the balance due on the note. The bankruptcy could have occurred for all the record shows before, during, or after 1956. Since the evidence does not establish that the debt became worthless in 1956, the determination of the respondent is approved. Partnership Deductions: Pacific Tobacco Company, 1953 (a) Casualty loss - theft, (b) Bad debts, (c) Entertainment Expenses (a) Casualty loss - theft. On its partnership return for 1953, Pacific Tobacco Company claimed a deduction of $1,540.98 *128 as a casualty loss from thefts. Respondent disallowed the deduction because the right to the deduction had not been established. The partnership sold tobacco principally through vending machines located in bars, restaurants, hotels, night clubs, and other places convenient to the public. The books and records indicate that the thefts were of cigarettes, cash, and vending machines with the latter making up the larger dollar amounts in the theft losses, i.e., $1,239.33, representing the depreciated cost of seven machines. Surber, a witness for respondent, testified that a substantial loss occurred although he did not remember the total figure. He also stated that he and Bromley discussed the thefts with the then accountant for the partnership, who made out the partnership's 1953 return (showing the theft losses) which was signed by Bromley. The evidence is sufficient in our opinion to overcome the prima facie correctness of respondent's determination. We hold that petitioner has established the right of the partnership to the deduction. (b) Bad debts. On its 1953 return Pacific Tobacco Company claimed a deduction of $1,694.56, representing three accounts that were charged off the *129 books as bad debts. The books and records show the names of the debtors and the amounts of their separate debts but we are uninformed as to the efforts taken to collect the accounts or how the debts were determined to be worthless in 1953. Petitioner has failed to carry his burden of proof as to these debts and respondent's determination is approved. (c) Entertainment expense. On its 1953 return the partnership deducted $3,802.48 as entertainment expenses. Respondent disallowed the deduction for failure to establish that the expenditure was made, or if made, that it constituted an ordinary and necessary business expense, or that it was expended for the purpose designated. Entertainment expenses for 1953 are entered in the partnership's promotion and entertainment account. This account shows that 11 checks aggregating $3,131 were issued to C. M. Surber during the year and charged to the account. The account also shows that 2,045 packages of cigarettes were distributed for good-will purposes and charged to the account. The amount charged to entertainment is about one-half of one percent of the partnership's gross receipts. Surber, managing partner during 1953, 1954, and 1955, and *130 Shima, who became the manager in 1956, testified to the necessity for entertainment and promotional expenditures in connection with the partnership business. The manager was responsible for promoting the business, obtaining locations, and keeping the customers satisfied. This involved buying drinks at night clubs and bars, free cartons of cigarettes to bartenders, taking them out to dinner, and other types of expenses used in promoting a public business. Considering the nature of the business, some expenditures for promotion and entertainment would be ordinary and necessary. Surber recalled that he and Bromley discussed the tax return with their accountant but he had no recollection whether entertainment expenses was one of the items considered. Later a new accounting firm for the partnership, prepared an amended return for 1953 which was signed by Surber and filed on or about August 27, 1955. The amended return made no change in the deduction for entertainment. At the hearing Surber testified that some time during December 1955 he went to the Honolulu offices of the Internal Revenue Service, and, among other things, informed them that Bromley had required him to divide the entertainment *131 and promotional checks among the partners. He related how he had drawn the partnership expense checks to himself, cashed them, and then handed the other partners' share over to Bromley, usually, or Humpert, or Bromberg. Humpert emphatically denied that he had ever received any entertainment expense money from Surber. He testified that the latter was mentally sick, and had attempted to extort money from him and Bromley by the use of recording tapes and threats to inform on them to revenue officials. The credibility of Surber is material to the issue. When he signed the 1953 amended partnership return in August 1955, Surber declared thereby that the $3,802.48 deduction for entertainment expense was true and correct. By December 1955 he was informing the internal revenue officials that the partners had fraudulently split the checks for entertainment expenses equally between them. At the trial, he reaffirmed his statement to the revenue officials but insisted that all of his portion of the expense checks (1/4) was spent for entertainment and promotion of the business, but he did not know of any entertainment or promotional expenses by his partners except on rare occasions when officials *132 of some tobacco company were in Honolulu. The record, contradictory as it is in some particulars, establishes the fact that the partnership had some entertainment and promotional expenses. We cannot, however, find any proof that justifies the deduction of $2,348.25 of the total amount claimed. This represents the portion of the total checks that Surber testified he turned over to the other partners. Accordingly, we approve respondent's disallowance of $2,348.25 of the entertainment deduction for 1953, and disapprove his disallowance of $1,454.23. Partnership Deductions: Pacific Tobacco Company Miscellaneous and General Expenses, and Promotional Expenses, 1954. On its 1954 return Pacific Tobacco Company deducted $1,983.05 as miscellaneous and general expenses. Respondent disallowed the deduction for failure (a) to establish that the expenditure was made, or if made, (b) was an ordinary and necessary expense, or (c) was expended for the purpose designated. Petitioner's proof includes a schedule of checks and entries which shows 67 entries with dates, payees, check numbers, and amounts. The aggregate amount of the entries is $1,966.05, or slightly less than the deduction claimed. *133 Surber, the managing partner, testified that he examined the 1954 return before he signed it and was satisfied that the amount deducted was right but he could not identify or explain the items listed and called to his attention. Except for the payees listed on the schedule and Surber's general statements that the items were proper deductions, we have no other identification or explanation of the miscellaneous and general expense entries. Such evidence is insufficient to establish that the items are ordinary and necessary business expenses. Respondent's disallowance of the deduction is therefore approved. On its 1954 return Pacific Tobacco Company deducted $8,607.59 as promotional expenses. Respondent disallowed the deduction for the same reasons as set forth in disallowing miscellaneous and general expenses, supra, and 1953 entertainment expense, supra. Part of petitioner's proof consists of a schedule showing promotional and advertising expenses of Pacific Tobacco Company for 1954. The schedule shows checks issued to C. M. Surber each month of the year, plus one on January 5, 1955, for $420. The 13 checks aggregated $5,626. The items making up the 1954 deduction for promotional *134 expenses are entered in the partnership's promotional and advertising account. This account shows 12 monthly checks issued to C. M. Surber during 1954 and one check, number 7276, dated January 5, 1955, for $420. The 13 checks aggregate $5,626 and leave $2,981.59 for other promotional expense items. The proof with respect to the 1954 expenses is essentially the same as for the 1953 entertainment expenses, except that Surber signed both the original and the amended partnership returns for 1954. For like reasons, we approve respondent's disallowance of $4,324.50 of the deduction claimed (three-fourths of $5,206 plus $420 check of January 5, 1955), and disapprove his disallowance of $4,283.09. Partnership Deductions: Pacific Tobacco Company, 1956 (a) Noncompetitive agreement, (b) Promotion and entertainment expenses, (c) Unclassified expenses. (a) Noncompetitive agreement. On its 1956 return the partnership claimed a $10,000 deduction for the noncompetitive agreement it secured from Surber in the agreement executed on March 1, 1956. On brief, respondent supports his disallowance of the deduction by requesting findings to the effect that Surber had decided early in 1956 to leave Hawaii *135 permanently and that the alleged noncompetitive agreement was drafted "partly to claim income tax deductions." Respondent also requested a finding that $24,000 of the agreed price merely constituted a return of capital and partnership drawings by Surber and the other $12,000 was paid for his one-fourth interest in the partnership. We cannot agree with respondent's position or make the findings requested. The agreement not to compete was entered into only after careful negotiations between adversary parties represented by counsel and an accountant. Surber and Bromley were advised separately of the tax consequences of the agreement not to compete. Under these circumstances we feel we must assume that the covenants were meaningful. We have held that strong proof must be presented by a party seeking to set aside his agreement not to compete. Emmette L. Barran, 39 T.C. 515 (1962), affirmed on this point 334 F. 2d 58 (C.A. 5, 1964). We think the same quantum of proof should be presented when respondent contends the covenant should be ignored. No such proof was presented. We hold that the partnership was entitled to the deduction. (b) Promotion and entertainment *136 expenses. The business conducted by the partnership in 1956 was the same as that conducted by it in 1953 and 1954 except that Shima, the 1956 manager, was an employee and not a managing partner like Surber. It is apparent from the nature of the business that some expenditures for promotion and entertainment were necessary and that such expenditures would be ordinary and necessary business expenses if reasonable in amount. The evidence establishes that the expenditures were made, were reasonable in amount ($859.79 of expenses on gross receipts of over $784,000), and were ordinary and necessary in the conduct of the business. Respondent erred in disallowing the $859.79 deduction for promotion and entertainment expenses. (c) Unclassified expenses. The proof offered as to these expenditures is entirely documentary. It consists of schedules showing the entries in the various accounts included in the $1,185.76 deduction claimed as unclassified expenses. Except for the dates and payees on the checks listed in the various accounts, we are uninformed about the expenditures reflected by these book entries. There is no testimony explaining the expenditures or identifying them with the ordinary *137 and necessary expenses of the partnership's business. We are unwilling to infer from the payee of the check that the amount thereof represented a deductible expense. Petitioner has the burden of proving that the partnership is entitled to the deduction. This he has failed to do. The determination of the respondent is approved. Partnership Deductions: Service Games, Guam, 1956. On his 1956 return petitioner deducted $12,344.47 as his distributive share of the ordinary loss sustained by Service Games, Guam, in 1956. Respondent disallowed the deduction because petitioner had not established that Service Games, Guam, sustained a loss. As proof of the loss, petitioner submitted in evidence a certified copy of the 1956 partnership return of Service Games, Guam, filed with the Government of Guam. The Commissioner of Revenue and Taxation of Guam stated in connection with the certification that the 1956 return had been accepted as filed without any change. The return shows a loss for the year of $24,688.94 and that Bromley's share thereof was $12,344.47. Respondent makes no request for any finding with respect to this deduction and makes no argument as to the issue. We believe petitioner's *138 proof is sufficient to overcome the prima facie correctness of respondent's determination. Since no other evidence was offered by either party with respect to this deduction, we disapprove respondent's determination and hold that the partnership sustained an ordinary loss and petitioner is entitled to his distributive share thereof. Decisions will be entered under Rule 50. Footnotes
*. Claimed in amended answer.↩
1. There seems to be an error of $3.30 which is unexplained.↩
*. Represents the entire depreciation deduction claimed on the 1955 partnership return of Service Games, Honolulu.↩
*. Omits net freight adjustments of $7,488.53.↩
1. Disallowed for lack of substantiation. In respondent's motion for continuance granted September 13, 1961, he states that his answers allege that the deficiencies and penalties are chiefly based upon bank deposits and increases in net worth.
[2]↩ Disallowed for failure to establish that such expenditure was made, or, if made, that it constituted an ordinary and necessary business expense, or was expended for the purpose designated.
3. On the same day that the John Raymond account was closed, the Robert Mason account was opened by withdrawing the $97.45 balance in the former and an initial deposit of $97.45 in the latter. Robert Black, the special agent in charge of investigating petitioner's tax liabilities for the taxable years, testified: Q. And into what account had all of the funds from these two accounts in the name of at least, partially in the name of Robert Mason and Jeff Jerome go? A. They had gone into the account of Service Games, Incorporated, Panama, at the - well, I am not sure which one, but one of the Service Games, Incorporated, Panama accounts. * * *
Q. And did you ever trace any specific deposit from these accounts into the Service Games, Inc., Panama account into any personal account of Martin J. Bromley or Allyn Bromley? A. All of the money was traced into the account of Service Games, Incorporated, Panama.↩
4. In his opening statement, respondent's counsel stated: Respondent's position, your Honor, is that this Panama thing is a smokescreen, it is an idle addition, it is a sham with no basis of actuality. The address might as well be the South Pole. The evidence will show that most of this business transpired and operated out of 210 Mokauea Street, which is right here in Honolulu. The evidence will show that Mr. Bromley had his office there. He had various employees there. Mail was sent there. Business was sent out of there. That was the address for his bank accounts, for many of the bank accounts and statements of this same Service Games, Incorporated, Panama. It operated right out of Honolulu.↩
5. Original cost of 2 Shuffle Alley machines was $868.60; total recovery was $1,821.44, which consisted of depreciation on original cost, $651.44; sold for $840 and fully depreciated in 1954 and 1955 by Jimmy & Ray Music Service; and sold by the latter in 1958 for $330. Original cost of 3 Ice Frolics was $1,744.56; total recovery was $2,742.07, viz., depreciation thereon totaled $1,272.07; and sold to Jimmy & Ray Music Service for $1,170, which fully depreciated them in 1955 and 1956 and sold them in 1958 for $300. Original cost of the Wurlitzer was $100, which was fully depreciated and then sold for $100 and again fully depreciated.↩
6. 28 U.S.C., c. 31, sec. 507(a)(3).↩
7. We are fortified in our interpretation of "operating entities" as here meaning business branches by respondent's counsel's opening statement where he refers to the depreciation taken by the partnerships as depreciation taken by the branches of the business.↩
8. Instances where total depreciation taken by successive partnership owners plus sale price exceeds cost paid by first partnership, appear in our discussion of the fraud issue with respect to depreciation.↩